OPINION. HaRkon, Judge: The narrow question in these proceedings is whether the 69 multiple unit houses sold in 1945 by Security Construction Company, the partnership, were houses that were held primarily for sale to customers in the ordinary course of the partnership’s business, as the Commissioner has determined. If the houses were not so held and were held as “investment” property for more than 6 months before sale, the gain from the sales can be treated as long-term capital gain. Nelson A. Farry, 13 T. C. 8, 13. The applicable statutory provisions are contained in sections 117 (a) (1) and 117 (j), Internal Kevenue Code. The question to be decided is essentially one of fact. Mauldin v. Commissioner, 195 F. 2d 714, 716; King v. Commissioner, 189 F. 2d 122, 124, certiorari denied 342 U. S. 829; Rubino v. Commissioner, 186 F. 2d 304, certiorari denied 342 U. S. 814. The petitioners contend that the 69 houses in question were capital assets in that they were primarily held for rent for investment in a distinctly separate and new business of the partnership, namely, a business of renting property for investment. The burden of proof is upon the petitioners to prove that the Commissioner’s determination is in error. That is to say, they must prove that the 69 houses in question were not held primarily for sale to customers in the ordinary course of business. Greene v. Commissioner, 141 F. 2d 645, certiorari denied 323 U. S. 717; Commissioner v. Boeing, 106 F. 2d 305, certiorari denied 308 U. S. 619. In considering all of the evidence, we have recognized that although there are several factors which are helpful in determining whether property is held primarily for sale to customers in the ordinary course of business, or whether it is sold as a capital asset, no single test is determinative. Mauldin v. Commissioner, supra. We have weighed all of the evidence to find out whether the 69 houses were acquired for sale or investment, and whether they were held for sale or investment; to ascertain, truly, whether the partnership ever carried on a business of renting residential property for investment, distinct and apart from its admitted, original business of building and selling houses; to determine, truly, whether the partnership in 1944, made a bona fide change from its original purpose to build the 69 multiple unit houses for sale to those who would comply with N. H. A. regulations about rental and sale to defense workers to a new purpose to hold them for rent for investment purposes. We have considered frequency and continuity of sales; the activities of the partners and the agents of the partnership acting in its behalf and under its directions ; the extent or substantiality of the transactions. We recognize that the purpose for which the property was held when sold is entitled to considerable weight. Carl Marks & Co., 12 T. C. 1196; Rollingwood Corp. v. Commissioner, 190 F. 2d 263. We recognize, also, that a taxpayer can engage in a dual business, that of selling property and that of renting investment property, Nelson A. Farry, sufra, and that if property originally acquired for investment in a business of renting property for investment is sold as a capital asset, the gain is subject to capital gains treatment, Victory Housing No. 2, Inc. v. Commissioner, 205 F. 2d 371 (C. A. 10), reversing 18 T. C. 466. The contentions of petitioners have been fully considered, giving attention to the several factors which they emphasize. They rely, for authority in support of their contentions, chiefly upon Nelson A. Farry, supra; and Carl Marks & Co., supra. They cite, also, several unreported memorandum decisions of this Court. Our conclusion, based upon the findings and ultimate findings, is that the 69 multiple houses were held primarily for sale to customers in the ordinary course of the partnership’s business of building and selling houses during 1944 and 1945, and, at least during 1945, when they were sold, and that they were not at any time “investment” property — capital assets of a business of renting property for investment. These conclusions are based upon the entire record. We must reject the petitioners’ assertion, as unsubstantial, that the original purpose of building the 69 multiple unit houses for sale to nonoccupants, and under N. H. A. regulations and restrictions, changed in 1944 to a bona fide intention and purpose of renting the houses and holding them for investment. And we have concluded that the petitioners have failed in their burden of proving that the 69 houses were “investment properties and were not-held primarily for sale to customers in the ordinary course of business. Although the findings set forth the facts in detail, we think the following should be noted here: In the first place, the business of the partnership from its inception was building houses for sale and, until 1944, it never held any rental property. In order to continue its business of building houses, it had to obtain priorities for construction materials, and only for multiple unit houses were priorities granted, at first. Therefore, the partners applied for priorities to build the 69 multiple unit houses with the intention of selling them to nonoccu-pants, subject to Government restrictions, as it could do under the N. H. A. regulations, under which the partnership, the builder, or its transferees should rent the houses to eligible defense workers. Before construction of the first group of multiple unit houses, 56, was undertaken, F. H. A. enlarged the classification of defense housing to include single unit houses, and N. H. A. amended its basic order to permit a builder to sell to defense workers upon completion, without first renting to defense workers, one-third of its houses, provided a sale was made.within 15 days after the final inspection. It is perfectly obvious that the partners calculated that by applying for authorization to build 13 additional multiple unit houses, they could apply for priorities to build 109 single unit houses, which could be sold upon completion, because by combining construction on tracts 13170 and 13171 into one project, 319 dwelling units would be constructed. The applications for priorities to build 69 multiple unit houses were made, therefore, in order to obtain priorities for building the 109 single unit houses for immediate sale to defense workers without first renting. That, however, did not foreclose the partnership from building, also, the 69 multiple unit houses for sale. Even though the regulations required that the 69 multiple unit houses, comprising the remaining two-thirds of the entire number of dwelling units, had to be rented for 2 months, at least, before they could be sold to defense workers, they could, nevertheless, be sold upon completion to nonoccupants subject to the restrictions as to rental and sale to defense workers. Edgar Cohn was aware of this, as his testimony shows. He testified (page 140 of the transcript) that the 69 houses could be rented and they could be sold at any time. The renting of the units in the 69 multiple unit houses by the partnership did not preclude its selling any one of the 69 houses. In fact, Edgar Cohn, in his testimony, indicated clearly that it was desirable to have tenants in the dwelling units when offering a house for sale to a nonoccupant who could take assignment of leases. It was not inconsistent with an intent to sell the 69 multiple unit houses that the 109 single unit houses were sold first, or that the multiple unit houses were rented prior to the sales thereof. It is also quite conceivable it was desirable to sell the 109 single unit houses first; they had to be sold, if at all, within 15 days of completion, and it took 3 months, until September 1944, to sell the 109 single unit houses which were completed after the construction of the first 56 multiple unit houses. At best, the evidence, in our opinion, shows merely a dual purpose, namely, to rent the multiple unit houses until such time as it would be profitable and convenient to sell them. In that situation it must be concluded that “one of the essential purposes (in acquiring or holding the houses) is the purpose of sale,” Rollingwood Corp. v. Commissioner, supra, and the profit on sale cannot be treated as capital gain. The fact that the 69 houses were rented is not inconsistent with a purpose to hold the houses primarily for sale, Rubino v. Commissioner, supra; Niels Schultz, 44 B. T. A. 146; Charles H. Black, Sr., 45 B. T. A. 204; Walter G. Morley, 8 T. C. 904, particularly where, as here, the houses were rented for varying periods of from 9 to 20 months. Cf. Nelson A. Farry, supra, where most of the properties were rented for from 1 to 11 years. In these proceedings, upon all of the evidence, the rental of the units in the 69 houses cannot be construed as anything more than an incidental activity. It is observed, also, that the total net profit realized upon the sales of the 69 houses in 1945, based on sales prices, was $238,329, more than 6 times the net rentals received in 1944, $28,793. There were, in 1945, the frequency, continuity, and substantiality of sales usually indicative of holding property primarily for sale. Neither the financing of the construction of the 69 houses, nor the manner of selling them, differed in any substantial respect from that of financing and selling the 109 single unit houses. All of the 178 houses constructed in 1944 were sold by real estate brokers engaged by the partnership on a commission basis. The petitioners1 argue that these proceedings come within the ambit of the Farry case, the chief authority cited, but the facts of the Farry case are different from the facts here in many important respects as is clear from the following: In the Farry case, the taxable years were 1944 and 1945. Nelson A. Farry had been in the business of managing properties and collecting rents since 1927. Beginning in 1934, he began accumulating rental properties, some of which he bought and some of which he built. At the end of 1941, he owned 45 rental properties comprising about 100 rental units, and in 1943, he acquired 18 more rental properties. Farry, clearly, was in the business of acquiring rental properties, and renting them for investment. In 1944, he sold 19 of his rental properties, and in 1945, he sold 27, a total of 46. Of all of the parcels sold, more than 15 had been rented from 5 to 11 years; 23 had been rented from 1 to 5 years; and 2 had been rented from 6 months to 1 year. Farry decided to liquidate his rental properties because the demand for housing, not investment properties, in Dallas late in 1948, had become extremely large. Rental vacancies had been absorbed and people, in seeking a place to live, were willing to buy houses. Also, rent control was in effect, so that the interest on notes given by purchasers of houses would yield more than the rents from Farry’s rental properties. This Court concluded that Farry had proved “by overwhelming evidence that he purchased and held these rental properties primarily for investment purposes,” and that the fact that “in the taxable years he received satisfactory offers for some of them and sold them” did not establish that he was holding them primarily for sale to customers in the ordinary course of his trade or business. Farry also constructed houses for sale in two subdivisions which, generally, he sold soon after completion, but such houses were in no way related to or connected with his rental properties and were not in the same location. In contrast, in these proceedings, we have a business firm which, since its organization, had only built houses for sale. It was obliged to build some multiple unit houses in order to get priorities to continue in the building business. Admittedly, it intended, in the beginning, to sell the multiple unit houses. It began to sell the multiple unit houses 6 months after the last was completed; and admittedly, it took into consideration the tax advantages which might result from renting them for 6 months, at least, before putting them up for sale. We cannot say here that petitioners have proved that the partnership built and held the multiple unit houses primarily for investment purposes. Victory Housing No. 2, Inc. v. Commissioner, supra, is also sharply distinguishable from these proceedings. Victory Housing No. 2, Inc., was organized in October 1942. Its fiscal year began on July 1 and ended on June 30. The corporation was organized for the purpose of constructing rental houses for defense workers. At some time after March 17,1943, and during 1944, the corporation constructed 64 single family houses; 32 multiple unit houses, each containing 4 dwelling units; and 20 single houses, a total of 84 single unit houses, and 32 multiple unit houses. All of these houses were rented. During the period from July 1, 1943, to October 1, 1946, 3 years and 3 months, the period involved in the case, none of the 32 multiple unit houses were sold and the corporation held them for rental and investment purposes. During the period July 1, 1943, to April 10, 1946, 2 years and about 9 months, only 2 out of the 84 single unit houses were sold, and during the same period the remaining 82 single unit houses were rented. During 2y2 months, from April 10, 1946, to June 30, 1946, 42 single unit houses were sold; and between July 6,1946, and October 1,1946, the remaining 40 single unit houses were sold. In other words, from the time of the completion in 1943 and 1944 of the 116 buildings, until the period April 10, 1946, to June 30, 1946, the 114 buildings were rented, 2 having been sold before April 10, 1946. Houses were rented, before being offered for sale, for, roughly, from 2 to 2*4 years. Upon these facts, this Court found that the corporation was engaged in the business of owning and renting residential property during the taxable years. We also found that all of the houses were constructed for rental. The United States Court of Appeals concluded, in reviewing the decision of this Court, that the 42 single unit houses sold in 1946 constituted capital assets in the corporation’s rental business, and that the sales thereof constituted sales of capital assets. The Court of Appeals held, also, that the corporation did not abandon its rental business and that it did not change or enlarge its business so as to become engaged in a new business of buying or developing real estate for sale, and on this point reversed the decision of this Court. The Court of Appeals noted, too, that the corporation, when it sold the 42 single unit houses, did not list them with real estate brokers. In contrast to the Victory Housing case, we have here the reverse situation. Security Construction Company was organized to build houses for sale and it engaged in the business of building houses for sale. Admittedly, it built all of the controlled housing, single and multiple unit houses, for sale, and upon the evidence, we cannot find that it went into another business of renting houses for investment purposes. We cannot find that the 69 multiple unit houses were the capital assets of a rental business and that, therefore, in 1945, capital assets were sold. Walter B. Crabtree, 20 T. C. 841, is distinguishable on its facts. The respondent’s determinations are sustained. Decisions will be entered for the respondent.