Harry Slatkin Builders, Inc. v. Commissioner.
Harry Slatkin Builders, Inc. v. Commissioner
Docket No. 41078.
United States Tax Court
T.C. Memo 1955-3; 1955 Tax Ct. Memo LEXIS 336; 14 T.C.M. (CCH) 7; T.C.M. (RIA) 55003; January 13, 1955
Edgar W. Pugh, Esq., 3353 Penobscot Building, Detroit, Mich., for the petitioner. Charles Speed Gray, Esq., for the respondent. LEMIRE Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in petitioner's income taxes for the calendar years 1946 to 1949, inclusive, as follows: Year
Deficiency
1946
$14,605.07
1947
4,513.01
1948
6,006.94
1949
2,065.33
$27,190.35
A small part of the deficiency in each year is attributable to adjustments which the petitioner is not contesting. The sole issue with respect to the balance of the asserted liabilities for each of the foregoing years is whether or not certain defense housing units constructed by petitioner for rent to war workers and subsequently sold were held primarily for sale to customers in the ordinary *337 course of petitioner's trade or business or were held as part of an investment portfolio. The amount of gain in each year from such sales, some of which were reported on the installment method under section 44 of the Internal Revenue Code of 1939, was as follows: Year
Gain
1946
$84,822.79
1947
22,015.92
1948
17,326.22
1949
11,835.02
Some of the facts have been stipulated and are found accordingly. Petitioner was incorporated under the laws of the State of Michigan in 1931 under the name of Nine Minute Auto Wash, Inc. On or about April 2, 1935, its corporate name was changed to Harry Slatkin, Inc., and its charter was further amended to include as an authorized activity the business of building and general contracting and all other acts incident and necessary thereto. On or about June 6, 1941, petitioner's name was changed to Harry Slatkin Builders, Inc. Petitioner kept its books and records and filed its federal tax returns on the accrual basis for taxable years ending December 31. Timely income tax returns for the years 1946 to 1949, inclusive, were filed with the collector of internal revenue for the district of Michigan at Detroit. In its 1943 return *338 petitioner described its business as that of "general contractors and real estate." In 1944 and 1945 it used the description "building contractors," in 1946 "general building contractors," and in 1947, 1948 and 1949 "general contractors." In 1941 the petitioner commenced the construction of one-family frame houses for sale, financing them by short-term construction loans secured by mortgages on the properties. These houses were sold during construction or upon completion. With the imposition of wartime regulations upon residential construction, petitioner submitted numerous applications to the War Production Board, hereinafter referred to as the WPB, for the approval of construction of single houses for sale. Pursuant to such approval, petitioner constructed the following single houses, which were sold during construction and upon completion: Approximate
Number of
average sales
Approximate
Year
houses
price
sales
1941
15
$5,000
$ 75,000
1942
46
5,000
230,000
1943
101
5,850
590,000
1944
65
6,700
435,000
1945
15
6,700
100,000
1946
76
8,000
608,000
The advent of World War II, with the consequent mobilization of industry in *339 Detroit for war production, created a demand for labor far in excess of the local supply and the resulting immigration of defense plant workers created a serious housing shortage. Government restrictions were imposed on building materials and regulations were issued by the National Housing Agency, hereinafter referred to as the NHA, respecting the construction of houses for war workers. Builders were required to apply to the WPB for approval of residential projects in order to obtain priorities for materials entering into such construction. Building specifications and arrangements for financing of such housing were subject to the approval of the Federal Housing Administration, hereinafter referred to as the FHA. Under the NHA regulations effective as of November 17, 1943, private war housing begun on or after February 10, 1943, could be disposed of only to a war worker occupant who had been such for two months or to an eligible war worker if such sale was made within fifteen days after the issuance by the FHA of its completion report. Only one-third of a promoter's houses could be sold under the second method and then only at prices not in excess of maximums previously approved by *340 the NHA. Regional representatives of the NHA were authorized to relax such requirements under certain circumstances. In 1943 petitioner submitted four applications to the WPB for the construction of two defense housing rental projects. Three of the applications concerned the proposed construction of 84 family dwelling units in 42 duplex buildings on Evergreen Road between Westfield Street and Joy Road in Detroit, hereinafter referred to as the Detroit project. The fourth application was with respect to the construction of 44 family dwelling units, consisting of 22 duplex buildings, on Outer Drive between Wilson and Lawrence Streets in the City of Dearborn, a suburb of Detroit, hereinafter referred to as the Dearborn project. Pertinent information with respect to the applications for the Detroit project is as follows: Monthly
Number of
shelter and
family
services charges
Sales price
Date of
Date
dwelling
requested and
requested
application
approved
units
approved
and approved
1/ 8/43
3/ 6/43
44 $56
$6,000
7/30/43
9/10/43
30
56
None
9/16/30
10/16/43
10
54
None
The $6,000 sales price under the application dated *341 January 8, 1943, was with respect to only 22 of the 44 units involved. Construction of the units under this application was commenced in May of 1943 and they were completed between September 1943 and January 1944, inclusive. Construction of the units under the applications of July 30, 1943, and September 16, 1943, was completed during the period from June 1944 to December 1944, inclusive, except that only eight units were constructed under the latter application rather than the ten which had been approved. On August 12, 1943, a petition for a change in stipulated rental or sales price and a petition to rent war housing begun prior to February 10, 1943, were submitted to the NHA with respect to the 44 units covered by the application of January 8, 1943. These petitions were approved on or about August 30, 1943, resulting in an increase of the monthly rental of these units to $60.50 and the granting of permission to rent the 22 units originally designated for sale. On August 20, 1943, an application for the approval of the construction of 44 family dwelling units consisting of 22 duplex buildings in the Dearborn project was submitted to the WPB and was approved on September 7, 1943. The *342 approval authorized a charge of $56 for both shelter and tenant services but since no sales price was sought to be established, none was fixed. All 44 of the units in the Dearborn project were initially rented by the petitioner under the war housing regulations and have been rented continuously up to the present time. On October 1, 1943, petitioner prepared an application for submission to the WPB for approval of the construction of 36 duplex buildings (72 family dwelling units) on Woodworth and Ternes Streets between Michigan Avenue and Gildow Street in Dearborn, Michigan. This application was not submitted because petitioner was unable to acquire the land upon which it proposed to construct such units. On March 15, 1944, petitions were filed with the NHA for the approval of increases in the monthly rental charges and the sales prices of the units in both the Detroit and the Dearborn projects. The relief requested and that approved was as follows: (a) Two petitions, one for an increase in rent and the other for an increase in selling price, were filed for the 30 units in the Detroit project covered by the application of July 30, 1943. The applications sought the establishment *343 of a sales price for 20 of the units of $6,400 and an increase in the stipulated rent, including that for tenant services, $61to. A monthly rental charge of $59 was approved on April 27, 1944, and a sales price of $6,125 was approved on September 7, 1944. (b) A petition for the establishment of a sales price of $6,400 for five of the eight units of the Detroit project constructed under the application of September 16, 1943, was submitted on or about March 15, 1944, but was approved on September 7, 1944, only to the extent of $6,125. The remaining three units were designated for rent. (c) A petition for an increase in the total charge for rent of the 44 units in the Dearborn project from $56 to $61 was submitted on or about March 15, 1944, and was approved on April 27, 1944, in the amount of $59. Two of the 82 units constructed by petitioner in the Detroit project were sold upon completion in 1944, and the remaining units were rented until sold as follows: Years sold
Number of units
1945
3
1946
73
1947
1
1948
1
1949
2
80
The units sold in 1944 and 1945 were disposed of because of title difficulties and because of the poor condition of the units *344 themselves. The Dearborn project proved to be much more profitable than the Detroit project, each unit therein showing a net return for 1945 of $138.30, whereas the units in the Detroit project produced only $66.70 each in that year. The difference was due both to a lower tax rate on the Dearborn properties and to the fact that the tenants in the Detroit units paid little or no attention to the maintenance of their premises and disregarded the efforts of petitioner's caretaker to maintain the properties. Because of this lack of care, petitioner's officers concluded that the Detroit units were deteriorating rapidly and that the net return was even less than that shown by the books. On October 15, 1945, all Government restrictions with respect to the disposition of the dwelling units in the two projects were removed but the ceilings on rents were retained. Late in 1945 or early in 1946, petitioner's officers decided to dispose of the properties of the Detroit project and discussed their sale with a real estate broker, Paul Frischkorn. Frischkorn was the nephew of the president of Frischkorn Construction Company, which built homes having an excellent reputation in the Detroit area. *345 Early in 1946 the broker was instructed to proceed with the sale of the Detroit units but since he and the petitioner's officers were friends, no written agreement was entered into. Two large roadside signs were erected on the project which advertised the properties to be sold under the name of Frischkorn and gave the broker's telephone number. However, purchasers were informed, at least by the time of the closing, that the homes had been built by petitioner. Although the broker occasionally discussed the sales prices with the petitioner's officers, the latter remained in control of the disposition of the houses and the prices were changed by them from time to time. The 77 remaining units were disposed of as follows: 1946
Units
January
2
February
14
March
16
April
8
May
6
June
6
July
7
August
8
September
2
October
3
November
0
December
1
Total
73
October 1947
1
May 1948
1
January 1949
2
77
The sales prices in 1947 ranged from approximately $6,700 to approximately $7,300. The broker personally sold 71 of the 77 units offered for sale. Since the early part of 1946, the petitioner has engaged in a number of real estate projects apart *346 from the continued rental of the units of the Dearborn project. They included the acquisition of certain undeveloped land on March 22, 1946, in Detroit, on which it was proposed to construct a housing project, and the making of a deposit on November 16, 1946, of $500 towards the purchase of land in Dearborn adjacent to its rental project for the purpose of constructing multiple dwellings. Both projects had to be abandoned due to the inability of the petitioner to obtain a reclassification of the applicable zoning restrictions. In the latter part of October 1947, petitioner purchased land in Detroit in the vicinity of Southfield Road and the Chesapeake and Ohio Railroad line and had preliminary sketches prepared for a proposed housing project to be erected on this parcel. However, due to the proximity of the railroad, the petitioner was unable to obtain financing for the project. In January of 1948, the petitioner caused the formation of three corporations for the purpose of owning and operating housing projects on a tract of land acquired by the petitioner in Dearborn. Mortgage insurance for the construction loans was obtained from the FHA under the provisions of section 608 of *347 Title VI of the National Housing Act. The petitioner received the entire outstanding common stock of the three corporations in exchange for a conveyance of the land. The entire authorized preferred stock of the corporations was issued to FHA. The construction of the project was completed during 1949 and 1950. The number of units and the cost were as follows: Number
Construc-
of
tion
Subsidiary
units
cost
Oxford Apartments, Inc.
32
$285,399.32
Vassar Apartments, Inc.
56
504,567.56
Columbia Apartments, Inc.
28
248,517.85
The dwelling units contained in each of the projects were rented upon completion and have been rented continuously since that time by the respective corporations. In connection with the foregoing development, petitioner constructed in its own name a four-family flat on Madison Street in Dearborn at a total cost of $31,496.89, for which no financing was required. The building was rented upon completion and has been rented continuously by the petitioner ever since. In 1950 petitioner completed the construction of a retail store building at a cost of $123,212.49 on land owned by it at Plymouth Road and Rutland Street in Detroit. *348 This building was rented upon completion to the Kroger Grocery Company under a five-year lease executed in 1949 with a provision for renewal. The land upon which the building was erected had been acquired by the petitioner as part of a larger tract known as Harry Slatkin Plymouth Subdivision, and the balance of this tract was used by petitioner in the construction of approximately 110 houses for sale. In 1950 the petitioner acquired a tract of land in Royal Oak, Michigan, another suburb of Detroit, and in 1952 completed the construction thereon of a housing project of 25 family units known as Webster Terraces at a cost of $277,050.89. Each of the units was rented upon completion and had been rented continuously at the time of the hearing. In 1952 the petitioner acquired another tract of land in Royal Oak and commenced the construction thereon of 40 duplex buildings (80 family dwellings) at an estimated cost of $880,000. Approximately one-half of the dwelling units had been completed at the time of the hearing and were being rented by the petitioner. In addition, two brick buildings constructed by the petitioner in 1950 on land owned by it on James Couzens Highway in Detroit at *349 a cost of $59,271.25 were also being rented. Petitioner's gross sales, exclusive of the sales involved in this proceeding, and petitioner's gross income from rents for the taxable years 1941 to and including 1952 were as follows: Gross income
Year
Gross sales
from rents
1941
$ 72,372.25
1942
230,752.52
1943
590,270.67
$ 6,824.25
1944
434,360.48
55,409.80
1945
97,404.36
76,258.98
1946
853,510.73
47,385.06
1947
675,405.71
32,470.83
1948
447,328.95
34,182.89
1949
1,186,120.85
33,417.00
1950
1,260,820.98
44,444.11
1951
2,133,940.00
53,994.06
1952
3,239,658.02
66,994.04
During the years 1949 to and including 1952, the total income from rents received by the three corporations organized in 1948, all of the common stock of which was owned by the petitioner was as follows: Income
Year
from rents
1949
$ 22,586.11
1950
122,954.26
1951
122,458.60
1952
123,597.90
The dwelling units constituting the Detroit project and sold by petitioner during the years 1946 to 1949, inclusive, were held by it primarily for sale to its customers in the ordinary course of its trade or business. Opinion LEMIRE, Judge: *350 Petitioner was incorporated in 1931 and in 1935 its charter was amended to permit it to engage in the business of building and general contracting and all other acts incident and necessary thereto. In 1941 it commenced the business of constructing and selling one-family residential properties which were financed by short-term construction loans secured by mortgages. This activity increased greatly during and after the war years, petitioner's gross income therefrom rising from approximately $72,000 in 1941 to $850,000 in 1946, and to over $3,000,000 in 1952. In 1943 petitioner obtained the approval of the Federal Housing Administration for the construction of two defense housing projects, one involving 84 dwelling units contained in 42 duplex buildings in Detroit, Michigan, and the other 44 units in 22 duplex buildings in Dearborn, Michigan. Only 82 units were actually built in the Detroit project. The rental and the disposition of all of these dwelling units were subject to Government regulation, and ceiling prices were established with respect to the rents that could be charged and with respect to the sales prices on 22 of the Detroit units which petitioner was authorized to sell *351 to war workers. Two of the Detroit units were sold upon completion due to title difficulties and three were sold in 1945 due to their poor condition. The Detroit units proved to be considerably less profitable than those in Dearborn, which result was attributable primarily to the higher real estate taxes in the Detroit area, of which petitioner was presumably aware when it constructed the projects, and secondarily to the increased maintenance costs and the higher rate of deterioration on the Detroit properties due to a lower class of tenants therein who failed to properly care for their premises. In late 1945 or early 1946, subsequent to the lifting of all Government controls upon these defense housing projects except those respecting rent ceilings, the petitioner determined to dispose of the remaining Detroit units and authorized a broker under an oral arrangement to dispose of as many of the units as he possibly could. The broker erected two roadside signs advertising the properties for sale, and the remaining 77 units were sold by the end of 1949, 73 being sold in 1946, of which 59 were sold in the first seven months of that year. The Dearborn project was retained and petitioner *352 subsequently engaged in the construction and operation of several other commercial and housing rental projects. It is respondent's contention that the gain from the sale of the Detroit units, some of which were disposed of on the installment basis, constitutes ordinary income on the ground that the units were property held primarily for sale to customers in the ordinary course of petitioner's trade or business. The petitioner, on the other hand, argues that these dwelling units constituted an investment and that it is entitled to treat the gain from the sale as a capital gain under the provisions of section 117(j) of the Internal Revenue Code of 1939. The question of whether or not the Detroit properties were held by the petitioner primarily for sale to its customers in the ordinary course of its business or were part of an investment portfolio is one of fact. Rubino v. Commissioner, 186 Fed. (2d) 304, affirming T.C. memorandum opinion, filed Dec. 27, 1949 [8 TCM 1095,], certiorari denied, 342 U.S. 814; King v. Commissioner, 189 Fed. (2d) 122, 124, affirming T.C. memorandum opinion, filed Feb. 28, 1950 [9 TCM 136,], *353 certiorari denied, 342 U.S. 829. The burden is upon the petitioner to prove that the properties in question were not held primarily for such sale. Alice E. Cohn, 21 T.C. 90. This the petitioner has failed to do. Although no one test is decisive in determining whether or not property is held primarily for sale or for investment purposes, the courts have usually considered such factors as the purpose or nature of the acquisition of the property, the continuity of sales or sales related activities over a period of time, the frequency of the sales as opposed to isolated transactions, and the extent and substantiality of the transactions, as well as the activity of the seller or those acting under his instructions or on his behalf. Nathan D. Goldberg, 22 T.C. 533 (June 11, 1954); Alice E. Cohn, supra. We have previously indicated that the factor entitled to the greatest weight is the purpose for which the property was held during the period involved. Carl Marks & Co., 12 T.C. 1196; Walter R. Crabtree, 20 T.C. 841. There can be no question but that the sales by the petitioner were frequent, continuous and *354 substantial in 1946, since 73 out of 77 units were disposed of in that year, 59 of them in the first seven months and 71 of the 77 by the broker. Although the sales activities by the petitioner in connection with the disposal of the properties were apparently limited to turning the matter over to a real estate broker and to a reliance upon two roadside signs for advertising purposes, it seems evident that a ready market existed and the absence of a more extensive sales campaign is therefore immaterial. Nathan D. Goldberg, supra. Even though petitioner continued to hold for rent a number of units which under the applicable regulations could have been sold to war workers, we are not convinced that these units were acquired and held exclusively for investment purposes. The testimony of petitioner's secretary and general manager was very vague as to the reason for petitioner's initially applying for permission to sell 22 of the Detroit units and later applying for an increased sales price on those and on other units. The record reveals that after the controls on sales were lifted, petitioner rapidly disposed of all the Detroit units at prices much higher than those which *355 were obtainable while such controls were in effect. Petitioner's general manager testified that the Detroit project was disposed of because its rate of return was lower and its rate of deterioration was greater than that which the petitioner was experiencing with the Dearborn units. These circumstances point to the conclusion that event if the petitioner's original purpose in acquiring the property was to hold it for rent, such purpose was subsequently changed to holding the units for sale. Nathan D. Goldberg, supra.At the very best, the evidence shows that the petitioner had a dual purpose, namely, to rent the Detroit units only for so long a period of time as the rental income produced a better return than would the proceeds of a sale. In such a situation, it has been held that one of the essential purposes in acquiring or holding the property is the purpose of sale and that the profit on the sale cannot be treated as a capital gain. Alice E. Cohn, supra; Rollingwood Corp. v. Commissioner, 190 Fed. (2d) 263, affirming T.C. memorandum opinion, filed July 17, 1950 [9 TCM 597,]. Furthermore, even if the property had been acquired *356 by petitioner and held by it solely for investment prior to 1946 and the sales in question had been made in liquidation of its investment, such fact would not be decisive in petitioner's favor. If the method of disposal of properties originally acquired and held for investment is such as to constitute the entrance by the investor into a trade or business, then such sales are of property held primarily for sale to customers rather than of capital assets, Palos Verdes Corp. v. United States, 201 Fed. (2d) 256; J. C. Bradford, 22 T.C. 1057, and this rule is applied even where the disposal is prompted by the unprofitableness of the investment, Home Co. v. Commissioner, 212 Fed. (2d) 637, affirming a memorandum decision of this Court [12 TCM 741,]; Nathan D. Goldberg, supra. The activities of petitioner and of the broker acting on its behalf in disposing of the Detroit units were sufficient to constitute a trade or business. In support of its argument that the Detroit project sales were merely the liquidation of part of an investment portfolio, the petitioner points to its retention of the Dearborn project and to its construction *357 of other commercial and housing developments following the war, none of which have been sold. While stipulating as to the facts respecting such projects, the respondent objects to their materiality and relevancy on the ground that they concerned events subsequent to the years in issue herein. This objection is not well taken since such events have a definite bearing on the issues in this case by tending to indicate the continuation of a uniform course of action. Ehrman v. Commissioner, 120 Fed. (2d) 607, affirming 41 B.T.A. 652, and we have received such evidence previously, Albert Winnick, 21 T.C. 1029; Alice E. Cohn, supra.However, after a careful consideration of this factor, we have concluded that it does not outweigh the evidence to the contrary discussed above. The facts adduced with respect to the post-war rental projects of petitioner, while showing that a very small fraction of its post-war income has been derived from rental properties, are not persuasive that the units of the Detroit project were held exclusively for rent in 1946, but rather, are consistent with the conclusion that the petitioner was engaged in the business *358 of constructing houses for sale and not for investment purposes. Albert Winnick, supra.
The petitioner continued in the business of constructing houses for sale throughout the period 1946 to 1952 and, with the exception of the year 1945, its rental income was never more than five to ten per cent of its income derived from sales exclusive of the sales in issue. During 1950 to 1952, inclusive, this percentage dropped to between two and five per cent. So small an investment income would hardly have cushioned the fluctuations of the construction business which it is asserted was the reason for the establishment of the investment portfolio. Prior to the war the petitioner never engaged in the development of rental projects, which distinguishes the instant case from Walter R. Crabtree, supra, relied on by petitioner. We are not persuaded by the meager documentary evidence submitted that petitioner's income from its sales and from its rental activities were carefully segregated in its books of account. Cf. Carl Marks & Co., supra.Lastly, no evidence was presented as to the terms or nature of the tenancies under which the properties were rented, *359 conditions which could have had an important bearing upon the purpose for which the properties were held. One year leases would have been indicative of an investment program, while short-term leases or month to month tenancies would have indicated a retention of the freedom to sell. We therefore hold that the petitioner has failed to sustain its burden of showing that the properties in question were held for investment purposes and were not held primarily for sale to customers in the ordinary course of its trade or business. Decision will be entered under Rule 50.