NATHAN D. GOLDBERG, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

S. E. WOOD, JR., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 41243, 41244. Filed June 11, 1954.

*Geo. S. Atkinson, Esq.*, and *Tom B. Rhodes, Jr., Esq.*, for the petitioners.

*Jackson L. Bailey, Esq.*, and *R. S. Leigh, Esq.*, for the respondent.

## OPINION.

Tietjens, *Judge:* Petitioners concede that if respondent's determination of deficiencies is correct, the resulting liability is chargeable to them as transferees of the assets of Pinecrest corporation in amounts greater than the deficiencies.

Section 117 (a) of the Internal Revenue Code defines "capital assets" as property held by.the taxpayer, whether or not used in his trade or business, and then lists specific types of property excluded from this definition; among these is real property used in the taxpayer's trade or business. But gains from the sale of this type of property are accorded the same treatment by section 117 (j) as gains from the sale of capital assets held for more than 6 months. To qualify as "used in the taxpayer's trade or business" within the meaning of section 117 (j), real property must be so used, and must be held by the taxpayer for more than 6 months, but must not be held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. The only one of these requirements in controversy here is the last; so that the question to be decided is whether the 90 properties sold by Pinecrest in 1946 were held by it primarily for sale to customers in the ordinary course of its trade or business.

In deciding when property is held for sale to customers in the ordinary course of the taxpayer's trade or business, courts have evolved a number of considerations in the light of which the factual circumstances of each case are to be examined. Among these are the taxpayer's reason for acquiring the property in question, the sales activity

of the taxpayer or those acting on his behalf, such as making improvements to the property and soliciting sales by advertising or more direct approach to prospective buyers, the continuity of sales or sales-related activity over a period of time, and the number, frequency, and substantiality of sales. *Dunlap* v. *Oldham Lumber Co.*, (C. A. 5, 1950) 178 F. 2d 781; *Boomhower* v. *United States*, 74 F. Supp. 997. These considerations simply point up some of the factual circumstances that have been considered as indicative of the taxpayer's holding property for sale in the ordinary course of his business. They are by no means exclusive, nor is any one necessarily determinative. All of the circumstances of the sales in question must be considered in the light of the requirements of the statute.

We have found that from October 1943 until the beginning of 1946, Pinecrest held its properties for rental. This conclusion is inescapable, we think, since the whole Pinecrest venture was conceived as a rental project. In its application for an F. H. A. loan guarantee the corporation indicated that its purpose was to build rental units and this expressed intention was subsequently carried out between 1943 and 1945. Of course Pinecrest's chances of getting F. H. A. approval were enhanced by its agreeing to build much needed rental housing, and having obtained a loan guarantee from F. H. A. the corporation was restricted in the persons to whom it could sell its property. These factors may suggest some of the reasons why Pinecrest was in the rental business, but the reasons for the corporation's action are material only insofar as they help us to determine what conduct was actually followed. And in this instance they point to the conclusion that Pinecrest held its properties for rental in the early years of its business activity.

We think it is also true that by the beginning of 1946 Pinecrest had changed the nature of its business activity and was then holding its houses for sale. This is best indicated by the large number of sales made by the corporation in 1946, after F. H. A. restrictions on sales had been modified. In this year Pinecrest sold 90 houses, which were all of its holdings, and the corporation then went out of business. Also, some support for this conclusion is to be found in the fact that in each year prior to 1946 Pinecrest lost money from its rental business, even in 1945 when the project, according to petitioner Goldberg, had almost full occupancy. These circumstances indicate to us that, with the easing of F. H. A. restrictions on sales, the corporation decided to discontinue holding the Pinecrest properties for rental and to sell the 90 houses remaining in the project. Finally, the testimony of petitioner Goldberg, an experienced real estate broker, lends support to our finding. When asked whether it would have been practical from

a business standpoint to continue to rent Pinecrest's houses in 1945 and 1946, instead of selling them, he replied:

> Well, sir, it was a problematical thing; people were buying houses all over town everywhere they could get them, and I don't mind telling you, frankly, that there was a possibility that most of the tenants could have vacated the property out there [referring to the Pinecrest project], and we would have gotten back in the same financial slump we were in before we asked for the moratorium.

> \* \* \* \* \* \* \*

> And that is the way it appeared to us. *They* [Pinecrest's tenants] *were getting out, vacating some of our property and buying property elsewhere*, and we had such a difficult time in the early part of '44—like I say, only 30 houses were occupied out of 111, and we couldn't even meet the monthly payments due the National Life Insurance [Company], unless we dug in our pockets for the deficiency. [Emphasis supplied.]

There remains the additional question whether Pinecrest's activities were such as to put the corporation in the business of selling real estate in 1946. In determining this our principal concern is with the nature and extent of Pinecrest's activities in selling its properties. Under the circumstances here the original purpose of the corporation to rent the houses in the Pinecrest project loses its significance, inasmuch as we have found that by the beginning of 1946 this purpose had changed to holding them for sale. The petitioners testified that the corporation did not advertise the availability of its houses for purchase, paid no sales commissions, and did not actively solicit sales. As we have pointed out, the activity of the taxpayer in promoting the sale of property is ordinarily an important consideration in determining whether he was in the business of selling real property. Here, however, we think this is a consideration of lesser importance, since the petitioners admit that there was a demand to buy houses in Marshall, Texas, in 1946, and petitioner Goldberg testified that he could have sold more houses than he had available. Under such circumstances there would seem to be no necessity of advertising. The Pinecrest corporation sold 90 houses in the course of 1 year, 1946, realizing a profit of $58,675.41. As far as we are aware these sales continued over the whole year, the corporation being dissolved in December 1946. This number of sales over a 12-month period meets the test of frequency earlier laid down as a guide to reaching our decision here. We find it difficult to conceive of the making of 90 sales of real property in 1 year, handled by an experienced real estate broker, petitioner Goldberg, as a casual or sporadic activity, or to say that the sales were passive just because it was easy to sell houses. This number of sales would require, even in a seller's market, considerable activity in talking to prospective customers, showing them the properties for sale, and in entering into the necessary negotiations with those interested

in buying. In *Rollingwood Corp.* v. *Commissioner*, (C. A. 9, 1951) 190 F. 2d 263, the court commented as follows on the significance of the number of sales made by the taxpayer (p. 267) :

Petitioners insist that the sales were passive in that there were no "for sale" signs and no sales force. But the number of sales speak for themselves.

There can be no question of the substantialness of the sales made by Pinecrest in 1946. The 90 houses sold by the corporation in this year were all that it had left from the original 111 in the project. We are of the opinion, therefore, that measured by the test of frequency, continuity, and substantiality, the activities of Pinecrest in disposing of its properties put the corporation in the business of selling real estate. Cf. *Rollingwood Corp.* v. *Commissioner*, *supra; Albert Winnick*, 21 T. C. 1029; and *Home Co.* v. *Commissioner*, (C. A. 10, 1954) 212 F. 2d 637.

The petitioners contend that *Victory Housing No. 2* v. *Commissioner*, (C. A. 10, 1953) 205 F. 2d 371, should control the result here. We do not agree. The basis for the Court of Appeals' ruling favorable to the taxpayer in that case was that there was

a complete absence of any facts supporting the conclusion that petitioner abandoned its rental business and engaged in the real estate business or engaged in the additional activities of a real estate business for the purpose of selling these capital assets in the ordinary course of such new business to its customers.

Here we think there is no absence of such supporting facts. Pinecrest was losing money from its rental activities and in 1946, after the easing of Government restrictions on selling, it sold all of the houses it then owned, and was dissolved. For us the only reasonable inference from these facts is that when the opportunity was presented, the corporation decided to get out of the unprofitable rental business and to dispose of its properties: And, as we have indicated, the making of 90 sales of realty over a 1-year period meets the test of frequency, continuity, and substantiality and puts the corporation in the business of selling real estate. In *Victory Housing No. 2*, *supra*, the corporation carried on the dual activity of renting and selling, and continued in the rental business after the sales in question were made, which led the Court of Appeals to conclude that its sales were merely incidental to the corporation's rental business. Also to be distinguished from the instant case is *McGah* v. *Commissioner*, (C. A. 9, 1954) 210 F. 2d 769. There, in holding for the taxpayers the court found that their sales of property were not voluntary, but were made under compulsion of their creditors; and that, despite the number of sales made, the taxpayers stayed in the rental business, continuing to rent over one-third of their properties during and after the taxable year. Here, although Pinecrest was losing money from its rentals,

its decision to get out of the rental business was not forced; nor did it continue in the rental business, having disposed of all of its remaining properties in 1946.

*Decisions will be entered for the respondent.*