CAMP WOLTERS ENTERPRISES, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 35561. Filed June 30, 1954.

*R. B. Cannon, Esq.*, for the petitioner.
*J. Marvin Kelley, Esq.*, for the respondent.

738

740

OPINION.

BLACK, *Judge:* 1. The major issue involves determining the correct basis of the buildings and improvements acquired from the Government by the petitioner. Respondent argues that their basis is composed only of the following:

| | |
|---|---:|
| Cash paid to the Government under the "contract" of purchase | $412, 500 |
| Paid the Dennis Group's nominee (Mims) for assignment of the purchase "contract" and restoration rights | 1, 424 |
| An unidentified and uncontested sum | 2, 350 |
| | $416, 274 |

Petitioner, on the other hand, contends that included in that basis is an additional $411,080.20 given the Dennis Group (through Mims) in building notes as further consideration for the assignment of the contract and restoration rights and that the correct total basis is, therefore, $827,354.20.

The Government had leased land for Camp Wolters with a clause requiring it to restore the land to its prior condition. It would have cost the Government an undetermined sum to have restored that land. The Dennis Group, composed of 89 members and acting through nominee Mims, first acquired the leased land along with the restoration rights from the original owners for approximately $151,000. On March 21, 1947, again acting through Mims, they concluded a contract with the Government under which they were to acquire the Camp Wolters buildings and improvements, constructed by the Government,

in return for $412,500 in cash and the release of all restoration rights. The interest of each member of the group in the assets, rights, and privileges of the group was in proportion to that member's cash contribution to the group fund. Petitioner was chartered on April 3, 1947, with 1,424 shares of fully paid common stock, plus paid-in capital surplus—the money for both the stock and surplus coming from the group fund. All of petitioner's stock was issued to members of the Dennis Group in proportion to each member's cash contribution to the aforementioned fund. On April 7, 1947, Mims (acting for the Dennis Group) conveyed the Camp Wolters land to petitioner and assigned the contract for the buildings and improvements, plus the restoration rights, to petitioner. In return therefor petitioner gave the following consideration:

A. For the land:
  89 nonnegotiable, unsecured installment notes (land notes) in the total face amount of $151,336.88—each note made out to a member of the Dennis group in proportion to that member's contribution to the group fund.

B. For the "contract" and restoration rights:
  $1,424 in cash.
  89 nonnegotiable, unsecured installment notes (building notes) in the total face amount of $411,080.20—each note made out to a member of the Dennis group in proportion to that member's contribution to the group fund.

Petitioner subsequently paid $412,500 to the Government for the Camp Wolters buildings and improvements, and released the restoration rights.

There is no doubt that the $412,500 cash payment to the Government is to be included in petitioner's basis for the buildings and improvements. Also the $1,424 and $2,350 heretofore mentioned are to be included. Respondent has included these amounts in his determination of the deficiencies. This leaves us to consider whether the basis should be increased by the $411,080.20 in building notes given by petitioner to the Dennis Group (through Mims) in consideration for the contract and restoration rights. Petitioner alleges that these notes should be included as a part of its cost in acquiring the buildings and improvements and, therefore, should be included in the basis of the latter.

We think petitioner cannot be sustained in its contention as to cost basis for reasons which follow.

We are of the opinion that the exchange of the contract and restoration rights in return for $1,424 and the building notes was one which fell within the provisions of sections 112 (b) (5) and 112 (c) (1) of the Code and, consequently, that the petitioner's basis for the contract and restoration rights must be determined under section

113 (a) (8).[4]  We first note that both before and after the exchange the Dennis Group owned all of petitioner's stock, *Peck & Peck*, 42 B. T. A. 651, and that the building notes received by each member of the Dennis Group were in proportion to that member's interest in the contract and restoration rights.  Consequently, both the control and proportionate interest tests of sections 112 (b) (5) and 112 (h) are met.  It is, however, necessary to consider whether the building notes qualify as "securities" within the meaning of section 112 (b) (5).  The stock of petitioner was issued for cash paid in by the Mims Group and is, therefore, not involved in the question we are now considering.

The identical phrase "stock or securities" is used in other subsections of section 112 and has been subject to considerable litigation on the question of which debt obligations qualify as "securities."  The line is drawn somewhere between long-term bonds and short-term notes. Short-term notes are not "securities." *Pinellas Ice & Cold Storage Co.*

---

[4] SEC. 112. RECOGNITION OF GAIN OR LOSS.
    (b) EXCHANGES SOLELY IN KIND.—

 *        *        *        *        *        *        *

    (5) TRANSFER TO CORPORATION CONTROLLED BY TRANSFEROR.—No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation, and immediately after the exchange such person or persons are in control of the corporation; but in the case of an exchange by two or more persons this paragraph shall apply only if the amount of the stock and securities received by each is substantially in proportion to his interest in the property prior to the exchange. * * *

 *        *        *        *        *        *        *

    (c) GAIN FROM EXCHANGES NOT SOLELY IN KIND.
    (1) If an exchange would be within the provisions of subsection (b) (1), (2), (3), or (5), or within the provisions of subsection (1), of this section if it were not for the fact that the property received in exchange consists not only of property permitted by such paragraph or by subsection (1) to be received without the recognition of gain, but also of other property or money, then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property.

 *        *        *        *        *        *        *

    (h) DEFINITION OF CONTROL.—As used in this section the term "control" means the ownership of stock possessing at least 80 per centum of the total combined voting power of all classes of stock entitled to vote and at least 80 per centum of the total number of shares of all other classes of stock of the corporation.

SEC. 113. ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS.
    (a) BASIS (UNADJUSTED) OF PROPERTY.—The basis of property shall be the cost of such property; except that—

 *        *        *        *        *        *        *

    (8) PROPERTY ACQUIRED BY ISSUANCE OF STOCK OR AS PAID-IN SURPLUS.—If the property was acquired after December 31, 1920, by a corporation—
        (A) by the issuance of its stock or securities in connection with a transaction described in section 112 (b) (5) (including, also, cases where part of the consideration for the transfer of such property to the corporation was property or money, in addition to such stock or securities), * * *

 *        *        *        *        *        *        *

    then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain or decreased in the amount of loss recognized to the transferor upon such transfer under the law applicable to the year in which the transfer was made.

v. *Commissioner*, 287 U. S. 462 (3½-month notes); *Commissioner* v. *Sisto Financial Corporation*, 139 F. 2d 253, reversing 47 B. T. A. 425 (demand notes); *Neville Coke & Chemical Co.*, 3 T. C. 113, affd. 148 F. 2d 599 (3-, 4-, and 5-year notes); *Pacific Public Service Co.*, 4 T. C. 742 (demand notes); *Wellington Fund, Inc.*, 4 T. C. 185 (12-month notes). On the other hand, long-term bonds have been held to be "securities." *Helvering* v. *Watts*, 296 U. S. 387 (mortgage bonds); *Daniel H. Burnham*, 33 B. T. A. 147, affd. 86 F. 2d 776 (10-year unsecured notes); *Commissioner* v. *Freund*, 98 F. 2d 201, affirming B. T. A. Memorandum Opinion (6-year bonds); *Globe-News Publishing Co.*, 3 T. C. 1199 (25-year scrip).

While none of the foregoing cases involved section 112 (b) (5) transactions we take it that the words "stock or securities" have the same meaning when used in section 112 (b) (5) as they do when used in section 112 (b) (3) and 112 (b) (4). We have been cited to no authority which holds to the contrary and we know of none.

The test as to whether notes are securities is not a mechanical determination of the time period of the note. Though time is an important factor, the controlling consideration is an over-all evaluation of the nature of the debt, degree of participation and continuing interest in the business, the extent of proprietary interest compared with the similarity of the note to a cash payment, the purpose of the advances, etc. It is not necessary for the debt obligation to be the equivalent of stock since section 112 (b) (5) specifically includes both "stock" and "securities."

In *Wellington Fund, Inc.*, *supra*, we said at p. 189:

The question of the meaning of the term "securities," as used in various revenue statutes, has been considered by the courts in a number of cases. The rule appears to be settled that where such an act does not define the term, it denotes an obligation of a character giving the creditor some assured participation in the business of the debtor, or, in other words, an investment in the business, and that the term does not include evidences of indebtedness for short term loans representing temporary advances for current corporate needs. *Pinellas Ice & Cold Storage Co.* v. *Commissioner*, 287 U. S. 462; *Cortland Specialty Co.* v. *Commissioner*, 60 Fed. (2d) 937; certiorari denied 288 U. S. 599; *L. & E. Stirn, Inc.* v. *Commissioner*, 107 Fed. (2d) 390; *Commissioner* v. *Sisto Financial Corporation*, 139 Fed. (2d) 253.

In our recent decision in *Neville Coke & Chemical Co.*, 3 T. C. 113, we held that a creditor holding three, four, and five-year notes of a corporation, evidencing advances made to meet current liabilities, was not, because of that fact, a holder of securities of the corporation, since such notes could not be considered investments in the business and thus did not constitute securities within the purview of section 112 (b) (3) of the Revenue Act of 1936.

In the *Globe-News Publishing Co.*, *supra*, we said at pp. 1204–1205, the following:

In further support of its claim that the issuance of the scrip must be recognized as the payment of a taxable dividend, the petitioner argues that the scrip

did not constitute securities, and for that reason section 112 (b) (3), *supra*, is not applicable. In making this argument, it classifies the scrip as "only an unsecured note and obligation to pay." The contention is, we think, without merit. Securities may take the form of shares of stock, bonds, or notes. *Commissioner* v. *Neustadt's Trust*, 131 Fed. (2d) 528 (20-year debenture bonds); *Commissioner* v. *Kolb*, 100 Fed. (2d) 920 (10-year debenture); *South Atlantic Steamship Line*, *supra* (25-year debenture bonds); *Humphryes Manufacturing Co.*, 45 B. T. A. 114 (stock); *Knapp-Monarch Co.*, *supra* (stock); *Burnham* v. *Commissioner*, 86 Fed. (2d) 776 (notes); *Skenandoa Rayon Corporation* v. *Commissioner*, *supra* (stock); *Clarence J. Schoo*, 47 B. T. A. 459 (25-year debenture); *Karl B. Segall*, 38 B. T. A. 43 (debenture notes).

The scrip in the instant case was payable on or before 25 years from the date of issuance, at the option of the petitioner. It called for interest at 4 percent annually, which was cumulative and payable on any subsequent interest payment date, as petitioner's directors might determine. Failure to pay the interest when due did not affect or accelerate the maturity date of the scrip. The scrip was transferable only on the dividend book of the petitioner and was subordinate to the payment of principal and interest due or to become due on the outstanding bonds of the company and to the sinking fund provided for the payment of such bonds. Such being the character of the scrip, the scrip certificates issued evidenced such a continuing interest in the affairs of the petitioner as to constitute them securities within the meaning of section 112 (b) (3), *supra*. See and compare *Pinellas Ice & Cold Storage Co.* v. *Commissioner* 287 U. S. 462.

In the instant case, the petitioner issued 89 nonnegotiable unsecured installment notes in exchange for the assignment of the contract and restoration rights on April 7, 1947, four days after petitioner was incorporated. The contract and restoration rights constituted permanent contributions to petitioner's business, not merely temporary advances of rights to be used for current needs. These interest bearing notes became due in five equal annual installments between the fifth and ninth years after issuance. Petitioner had the privilege of paying the notes off before the due date, subject to two general provisions: (1) Any payments on the notes had to be on a pro rata basis for the entire series of 89 notes. (2) Petitioner borrowed $325,000 from the Republic National Bank and no payment whatsoever was to be made on the notes until the $325,000 loan and any renewals, extensions, or refinancing had been completely liquidated. In other words, the latter requirement imposed a condition precedent to the due date of the notes. In the event petitioner had been unsuccessful and unable to pay off the prior loan, the holders of the 89 notes had no right to demand the installment payments on the due dates. It seems clear that the noteholders were assuming a substantial risk of petitioner's enterprise, and on the date of issuance were inextricably and indefinitely tied up with the success of the venture, in some respects similar to stockholders. As a matter of fact, all 89 notes were redeemed within 2 years, but we must examine the notes as of the date of issuance. Having considered all the facts, we conclude that the 89 notes constituted "securities" under

section 112 (b) (5) and that, consequently, the transaction falls within the provisions of that and the other aforementioned sections.

Our next question concerns the transferors' (Dennis Group) basis for the contract and restoration rights. This depends upon the transferors' cost of those items. Sec. 113 (a), I. R. C. There is no evidence in the record that any cost was incurred by the Dennis Group in concluding the contract with the Government. See *T. H. Symington & Son, Inc.*, 35 B. T. A. 711, 743.

As for the restoration rights, the transferors (through Mims) obtained those rights along with the Camp Wolters land by exercising the options assigned by the city of Mineral Wells. The option prices, aggregating about $151,000, were determined prior to any alterations of the land by the Government, and, consequently, at a time when the restoration rights had no determinable value. However, when the options were exercised, the condition of the land had been altered considerably by the Government, and the restoration rights, undoubtedly, had some substance.

Petitioner issued its notes for $411,080.20 to its stockholders in consideration of the transfer to it of the contract and the restoration rights. The restoration rights may have been, as petitioner argues, worth a considerable portion of this $411,080.20, but we do not have to determine their value at the time petitioner acquired them. Under our holding to the effect that section 112 (b) (5) is applicable, our task is to determine what these restoration rights cost the group from whom petitioner acquired them. We have determined that cost to be $50,000. While the evidence bearing upon this cost is not as satisfactory as it might be, we think it is sufficient to support our finding of $50,000. Cf. *Andrew P. Solt*, 19 T. C. 183.

We need not attempt to determine the precise gain the transferors realized as a result of exchanging the contract and restoration rights for the $1,424 and the $411,080.20 in building notes. Suffice it to say that we think it was at least equal to the $1,424, which is recognized gain under the provisions of sections 112 (b) (5) and 112 (c) (1) of the Code. Under section 113 (a) (8), therefore, the petitioner's basis for the contract and restoration rights is equal to the transferors' $50,-000 basis in the rights plus the $1,424 recognized gain—or $51,424.

To acquire the Camp Wolters buildings and improvements, petitioner, as aforementioned, (a) paid the Government $412,500 in cash, (b) expended an undisputed $2,350, and (c) exercised a contract and released restoration rights having a basis in its hands of $51,424. Under these circumstances it seems clear to us that petitioner's basis for the buildings and improvements was $466,274. This $466,274 is composed of the $416,274 which the Commissioner has allowed in his

determination of the deficiencies, plus $50,000, the cost to the Mims Group of the restoration rights.

2. Respondent (a) disallowed in toto the depreciation deductions on the Camp Wolters buildings and (b) reduced the deductions claimed on the remaining Camp Wolters depreciable property purchased by petitioner. The latter action was predicated on a reduction of petitioner's basis—with which we have just dealt—and on increasing the estimated useful lives of such depreciable property. Petitioner failed to produce any evidence rebutting respondent's determination of the useful lives of that property and, consequently, respondent's determination must stand as to the useful life of the equipment.

Respondent's complete disallowance of depreciation deductions on the buildings was based on his finding that petitioner purchased and held those buildings primarily for sale. Section 23 (1) of the Code provides for depreciation deductions for property "used in the trade or business" or "held for the production of income," and Regulations 111, section 29.23 (1)–2, reads, in pertinent part, as follows:

*Depreciable property.* The necessity for a depreciation allowance arises from the fact that certain property used in the business, or treated under § 29.23 (a)–15 as held by the taxpayer for the production of income, gradually approaches a point where its usefulness is exhausted. The allowance should be confined to property of this nature. * * * It does not apply to inventories or to stock in trade. * * *

The general distinction to be drawn, obviously, is between capital assets used in the trade or business or as an investment for the production of income, and property held for sale. See *Gertrude D. Walker*, 20 B. T. A. 937, affd. (C. A. 3) 63 F. 2d 351, certiorari denied 289 U. S. 746; but note I. T. 1342, I–1 C. B. 169 (special rule applicable to contractors).

Whether or not buildings are held for sale is a question of fact. The tests to be applied are the continuity, frequency, and substantiality of sales, though other factors are also relevant. *Mauldin* v. *Commissioner*, 195 F. 2d 714, affirming 16 T. C. 698; *Nathan D. Goldberg*, 22 T. C. 533. We think the evidence shows that when petitioner was organized it had a dual purpose: To sell buildings unsuitable for industrial purposes and to rent or sell (depending upon the requirements of the particular transaction) the suitable buildings to industries. The testimony of Dennis as to the petitioner's plans and objectives supports this interpretation.

It remains to be determined which buildings were held by petitioner for investment, or if it was engaged in a "trade or business" for use therein, rather than for sale. The burden of proving this rests upon petitioner. In this connection we note that the only relevant evidence indicates that frequent, substantial, and continuous sales of buildings

were made by petitioner. As the following table indicates, a substantial portion of petitioner's gross income was attributable to such sales, whereas a rather negligible portion was attributable to rents:

| Tax return figures of sources of gross income | Year ending Mar. 31, 1948 | Per cent | Year ending Mar. 31, 1949 | Per cent |
|---|---|---|---|---|
| Building sales | $336,196.00 | 66.8 | $133,249.75 | 64.1 |
| Rental income | 9,915.31 | 2 | 19,466.00 | 9.4 |
| Total gross income | 503,428.16 | 100 | 207,800.83 | 100 |

On the state of the record we conclude that petitioner has failed to show that any buildings, other than those actually rented, were held for investment or use rather than for sale. Consequently, depreciation deductions are allowable only on those buildings actually rented. Respondent erred in not allowing depreciation on those rented buildings. They were held for investment during the taxable years rather than primarily for sale in petitioner's business.

We have found that the remaining useful life of the buildings, for depreciation purposes, was 10 years on the date acquired by petitioner. The evidence supports this finding.

In its brief the petitioner for the first time challenges respondent's disallowance of capital gains treatment in the computation of income from the sale of some of the aforementioned buildings. We have carefully examined the petition and we find no assignment of error which alleges that the Commissioner erred in not according capital gains treatment to certain sales made by the petitioner during each of the taxable years and as to which it claimed the benefit of the capital gains provisions of the statute in the returns which it filed. Only issues raised by the pleadings can be considered by this Court. *Camp Wolters Land Co.*, 5 T. C. 336.

3. In an amended answer filed at the hearing respondent asserted that deductions taken by petitioner for $3,312.49 in interest paid on the land notes during the 1948 fiscal year and for $14,958.31 in interest paid on the building notes during the 1949 fiscal year, were improper and that the deficiencies should be increased. No mention was made of this issue in respondent's brief. We have found as a fact that those amounts of interest were actually paid by petitioner and can conceive of no reason why those payments are not properly deductible under section 23 (b) of the Code. Respondent's claim for increased deficiencies on account of these interest deductions is not sustained. We find no ground for it.

Reviewed by the Court.

*Decision will be entered under Rule 50.*