Vivian Smith v. Commissioner. Estate of Benjamin Burnett Smith, Deceased, Vivian Smith, Independent Executrix v. Commissioner.
Smith v. Commissioner
Docket Nos. 40903, 40904.
United States Tax Court
T.C. Memo 1955-35; 1955 Tax Ct. Memo LEXIS 304; 14 T.C.M. (CCH) 120; T.C.M. (RIA) 55035; February 10, 1955
*304 Ralph G. Langley, Esq., for the petitioners. W. B. Riley, Esq., for the respondent. LEMIRE Memorandum Findings of Fact and Opinion The two proceedings herein, which were consolidated by agreement at the time of the hearing, involve deficiencies in income taxes determined by the Commissioner as follows: 1945
1946
Vivian Smith
$10,399.38
$1,194.91
Estate of Benjamin Bur-
nett Smith, Deceased,
Vivian Smith, Independ-
ent Executrix
10,259.38
1,161.66
Only a part of the deficiencies for 1946 are in dispute. Benjamin Burnett Smith, now deceased, and his wife, Vivian Smith, filed separate income tax returns on a community property basis for the years in issue. All returns for the period here involved were filed with the collector of internal revenue for the first district of Texas. Vivian Smith is the independent executrix of the estate of her deceased husband, but since the community income of the petitioners during the years 1945 and 1946 was derived from the activities of Benjamin Burnett Smith he will be hereinafter referred to as the petitioner. The sole issue herein is whether the sale of 110 houses in 1945 and of 7 houses in *305 1946 by petitioner and his wife was of property held primarily for sale to customers in the ordinary course of petitioner's trade or business or whether such sales were of property held for investment purposes. Findings of Fact Some of the facts have been stipulated and are incorporated herein by this reference. From 1930 until 1945 petitioner was engaged in the business of building houses under contract in the vicinity of Houston, Texas. In the late 1930's he went into the lumber business and also engaged in what is known in the construction trade as "speculative building." The latter involved the purchase of vacant lots from subdividers and others, the construction of houses thereon, and the subsequent advertising and sale of these houses to the general public. In 1943, while petitioner was still engaged in speculative building and the construction of homes under contract, he and his wife organized and became the sole stockholders of two corporations, San Antonio Homes, Inc., and Richmond Homes, Inc. During 1943 and early 1944 both corporations built houses pursuant to National Housing Agency regulations, the substance of which is set forth below. At various times in the *306 early part of 1944 both corporations transferred houses to petitioner and his wife, the last such transfer taking place about July 1, 1944. The 117 houses sold by the petitioner and his wife in 1945 and 1946, the proceeds of which are involved in the proceedings herein, were houses so constructed and so received by petitioner and his wife from these corporations. The two corporations and later petitioner and his wife were subject to National Housing Agency regulations with respect to the holding and to the disposal of the houses. In brief, these regulations provided as follows: (a) For the duration of the emergency period, which commenced in September 1939 and ended in September 1945, all such housing was required to be held for rental only to specified eligible war workers. (b) In the event a vacancy occurred rerental could be made only to war workers. However, 60 days after completion, a petition could be filed with the National Housing Agency for permission to rent or rerent to persons other than war workers. (c) Each tenant had a 30-month option to purchase the house occupied by him at a specified price, which option could be exercised only after two months' continuous *307 occupancy of the premises by the tenant. The tenant was under no compulsion to buy and his option terminated when his tenancy ceased. This option was specified as being the only additional right over and above the ordinary landlord-tenant relationship included in the teerm "held for rental." (d) One-third of all the houses constructed by an owner under these regulations could be sold at any time following completion to any war worker provided the latter agreed either to occupy the house or to hold it subject to the same regulations. Such sales did not require the approval of the National Housing Agency. (e) Any house could be sold to a person who did not intend to occupy it as his dwelling provided such sale was made at a price within a specified range and the purchaser agreed to hold the house subject to the regulations. (f) Application could be made at any time 60 days after completion for permission to sell under conditions and on terms other than those specified. The approval of such application was required before the sale could be made. The restrictions as to the occupancy of the houses by war workers ended August 21, 1945, and those with respect to their sale on September 10, 1945. *308 Prior to his organization of San Antonio Homes, Inc., and Richmond Homes, Inc., in 1943, petitioner had never been in the business of renting houses. One-third of the houses built by the two corporations were sold upon completion and the remainder were rented to war workers. They remained rented for substantially all of the time during 1944, 1945, and 1946, when they were owned first by one of the two corporations and later by petitioner and his wife. There were no vacancies for any appreciable length of time and the demand for housing accommodations in the vicinity of petitioner's houses during 1945 and 1946 was very heavy. The rentals were on a month to month basis. During 1943 to 1946, inclusive, petitioner maintained an office in San Antonio, Texas, in which he had three employees, an office manager, an assistant office manager, and a general maintenance man who devoted his full time to keeping the rented houses in good repair. The office was run as a rental office, both during the ownership of the houses by the two corporations and after the transfers to petitioner and his wife. The tenants paid their rents there and made their complaints through this office. It was always *309 petitioner's policy to keep the houses in an excellent state of repair. From time to time various tenants exercised their options to purchase the houses occupied by them. A portion of their rent was applied to the purchase price. Petitioner did not make any effort to sell the rented houses to the tenants, did not advertise them for sale, and did not employ any salesmen during 1945 and 1946. The initial arrangements following the exercise of an option were handled by the manager of petitioner's office and subsequent and final arrangements by a title company. When petitioner did engage in a speculative building project he would advertise it and employ salesmen to dispose of the houses in that project. He had no such projects in progress during 1945 and 1946 but commenced planning for one in the latter part of 1946. The 117 houses built and rented by petitioner under the National Housing Agency regulations which remained on hand on January 1, 1945, were all sold by petitioner and his wife as follows: 1945
January
11
February
7
March
15
April
3
May
3
June
5
July
14
August
2
September
7
October
20
November
21
December
2
Sold in 1945
110
1946
March
2
June
5
Sold in 1946
7
Total
117
*310 All 7 of the houses sold by petitioner and his wife in 1946 had been held by them for more than 18 months, and 59 of the 110 houses sold in 1945 had been held by them for over one year. The remaining 51 houses sold in 1945 had been so held for over 6 months. The 117 houses sold by petitioner (and his wife) in 1945 and 1946 were held by him primarily for sale to customers in the ordinary course of his trade or business. Opinion LEMIRE, Judge: The sole question presented herein is whether the 117 houses sold by petitioner and his wife in 1945 and 1946 were held by them as an investment or whether they were held primarily for sale to customers in the ordinary course of petitioner's trade or business. If the former, then the petitioner and his wife would be taxable on the gain at capital gain rates under section 117(j) of the Internal Revenue Code of 1939. If the latter, the gain would be ordinary income. It has been previously held that this issue is one of fact, Rubino v. Commissioner, 186 Fed. (2d) 304, affirming T.C. Memorandum Opinion filed December 28, 1949 [8 TCM 1095, ], certiorari denied, 342 U.S. 814; King v. Commissioner, 189 Fed. (2d) 122, 124, *311 affirming T.C. Memorandum Opinion filed February 28, 1950, [9 TCM 136,], certiorari denied, 342 U.S. 829, and that the burden is upon the petitioner to prove that the properties in question were not held primarily for such sale, Alice E. Cohn, 21 T.C. 90. It is our conclusion that not only has the petitioner failed to meet this burden, but that the evidence clearly shows that the houses were held primarily for sale and not as an investment. While no one test is decisive, the factors usually considered by the courts in dealing with cases such as this are the purpose or nature of the acquisition of the property, the continuity of sales or sales related activities over a period of time, the frequency of the sales as opposed to isolated transactions, and the extent and substantiality of the transactions, as well as the activity of the seller or those acting under his instructions or on his behalf. Nathan D. Goldberg, 22 T.C. 533; Alice E. Cohn, supra. The factor entitled to the greatest weight is the purpose for which the property is held during the period immediately preceding the initiation of the action necessary *312 to dispose of it. Carl Marks & Co., 12 T.C. 1196; Walter R. Crabtree, 20 T.C. 841. It is obvious that the 110 sales in 1945, supplemented by the sale in 1946 of the last 7 houses, constituted transactions which were frequent, continuous, and substantial. Even if petitioner and his wife had originally acquired the houses for investment purposes, such a volume of sales would be indicative of their entrance into the business of holding the houses for sale. Palos Verdes Corp. v. United States, 201 Fed. (2d) 256; J. C. Bradford, 22 T.C. 1057. The absence of advertising or of a sales campaign is immaterial in view of the heavy demand for housing accommodations in the locality. Nathan D. Goldberg, supra. There is nothing in the record, however, to indicate that the houses ever were acquired as an investment. Petitioner had never previously been in the rental business but had always built houses for sale. He had no other projects and was still engaged in his original construction business at the time he started this project. One-third of the houses, the maximum number permitted by the National Housing Agency regulations, *313 were sold upon completion and the remainder were rented on a month to month basis rather than on long-term leases. To the contrary, the record affirmatively establishes that it would have been difficult, if not impossible, for petitioner to have held the houses as an investment for the leases provided the tenants with 30-month purchase options which constituted continuing offers to sell. The petitioner, or any purchaser from him, had to be prepared over this 30-month period to transfer title to the tenant at a specified price regardless of the market price of the house or of their desire to retain it as a source of rental income. Under such circumstances, it is clear that the houses were held primarily for sale. It is immaterial that the granting of the options was required by Government regulations. Petitioner knew of this condition when he accepted the Government's terms for permission to build the project and may well have considered it as providing a ready market for the houses. Rollingwood Corp. v. Commissioner, 190 Fed. (2d) 263, affirming T. C. Memorandum Opinion filed July 17, 1950 [9 TCM 597,]. The case of Thomas E. Wood, 16 T.C. 213, *314 relied upon by the petitioner, is clearly distinguishable since the situation presented by the instant case is not one of gradual and passive liquidation of a bad investment. Decision will be entered for the respondent.