T.C. Memo. 2005-127

UNITED STATES TAX COURT

DAVID TAYLOR ENTERPRISES, INC. & SUBSIDIARIES, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 7698-03.                    Filed May 31, 2005.

<u>Lawrence Sherlock</u> and <u>Juan F. Vasquez, Jr.</u>, for petitioner.

<u>Derek B. Matta</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

KROUPA, <u>Judge</u>:  Respondent determined deficiencies of
$431,114[1] for 1999[2] and $113,390 for 2000 in petitioner's Federal
income taxes.  The issue to be decided is whether losses realized

---

[1]All amounts have been rounded to the nearest dollar.

[2]Petitioner's tax year ended June 30.

on the sale of classic cars during the years at issue are capital or ordinary losses under section 1221(a).[3] Resolution of this issue depends on whether the classic cars were held primarily for sale to customers in the ordinary course of business or were held instead for investment purposes. We hold that petitioner held the classic cars for sale to customers.

FINDINGS OF FACT

The parties have stipulated some facts. The stipulation of facts and accompanying exhibits are incorporated by this reference and are so found.

David Taylor Enterprises

Petitioner is an affiliated group of corporations that files consolidated income tax returns. See sec. 1501. The common parent of the affiliated group is David Taylor Enterprises, Inc. (DTE). Until his death, David Taylor, Sr. (Mr. Taylor) owned all the shares of DTE. DTE's principal place of business was Houston, Texas, at the time it filed the petition.

David Taylor Cadillac

Cars were Mr. Taylor's love and passion, and he was involved in the car business throughout his life. When he was a child, Mr. Taylor's father was an Oldsmobile-Cadillac dealer in Port

[3]All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

Arthur, Texas.  From 1975 until his untimely death in 1997, Mr. Taylor was a car dealer and engaged in the trade or business of selling cars.  Mr. Taylor was also a member of the Houston Auto Dealers Association, the Texas Auto Dealers Association, and the National Auto Dealers Association.

In 1974, Mr. Taylor sold a Buick Dealership in Beaumont, Texas, and a year later acquired the right from General Motors to open a Cadillac dealership in Houston, Texas, known as David Taylor Cadillac (the dealership).  The dealership was one of the largest Cadillac dealers in the world, and was, at the time of trial, a subsidiary of petitioner.  The dealership is the main focus of our case.

The dealership owned new, used, and classic cars.  The new and used cars were located in Houston, Texas, while the classic cars were located in Galveston, Texas.

Classic Cars

The dealership began to acquire classic cars in 1979.[4] Initially, the dealership purchased a 1931 Cadillac Roadster for $40,000.  The dealership then purchased two classic cars in the mid-1980s, a 1934 Ford Roadster and a 1932 Ford Victoria, that came as kits and required assemblage.  After the initial purchases, the dealership acquired additional classic cars,

---

[4]Classic cars are cars whose model year is generally 1970 or before.  The dealership applied for exhibition license plates for its classic cars, indicating the cars were at least 25 years old.

either by purchase, exchange of one classic car for another, or as trade-ins from new car customers to reduce the purchase price of a new Cadillac or Buick.  The dealership's purpose in acquiring the classic cars was to enhance their value by restoring them and selling them at a premium price.[5]

The dealership viewed potential buyers of the classic cars as a select group of mostly wealthy classic car enthusiasts, and designed a strategy to reach them.  The dealership's strategy involved building the dealership's reputation as a source of high quality classic cars by entering the cars in auctions, auto shows, classic car competitions, and displaying them at promotional events for the dealership or third parties.  For instance, the classic cars were displayed at events frequented by wealthy individuals, like the Alley Theatre and the annual Lakewood Yacht Club Wooden Keels and Classic Wheels event.  The classic cars were also prominently advertised in brochures, booklets, newspapers, and magazine articles, and a placard describing each car was also placed on each vehicle.

Potential buyers of the classic cars were directed to Mr. Taylor or a broker the dealership hired after Mr. Taylor died.

---

[5]The classic cars were insured, and the insurance policy covered "all owned antique, classic and special interest cars held for sale by the insured."  The classic cars were also taxed by local property taxing authorities as "motor vehicle inventory."

Until his death, Mr. Taylor personally negotiated the sales of the classic cars.

To command a premium price for the classic cars, a priority for the dealership and Mr. Taylor, the classic cars had to be restored to classic condition, maintained, and driveable at any time by potential customers. Restoring the cars involved a long process of fundamentally rebuilding the car to near perfection. After the cars were fully restored, the dealership carefully maintained them by setting the cars on jack stands so the tires maintained air pressure, starting the engines every 6 weeks, and changing the oil every 6 months.

In addition, the dealership kept the classic cars indoors to protect them from inclement weather. Initially, the classic cars were kept at the dealership or in Mr. Taylor's garage, and later were moved to a building the dealership bought that was located across the street from its main showroom. The cars were eventually moved to three adjacent buildings in Galveston, Texas (the Galveston property)[6] that the dealership purchased to provide the classic cars with a climate-controlled environment and to expose them to the public.[7]

---

[6]The Galveston property was acquired by David Taylor Realty, Inc., another member of the affiliated group.

[7]Petitioner decided to operate the Galveston property as a museum and charge admission. Petitioner named the property the David Taylor Classic Car Museum. Operating the Galveston

(continued...)

The dealership intended to recoup its costs of restoring the classic cars by selling them at a profit. In 1990, the dealership sold a Packard convertible for $330,000, earning a profit of $143,340. The dealership made three more sales that year, and three in the succeeding year.[8] The dealership thereafter strategically began acquiring more classic cars and increasing its participation in promotional events to generate interest, win competitions, and service the wealthy clientele the dealership hoped would follow. This plan was abruptly derailed in 1997 when Mr. Taylor died, within a month of being diagnosed with lung cancer.

Mr. Taylor's shares in the dealership represented most of the value of his estate. To raise money for the estate tax, Mr. Taylor's estate requested a liquidation of the DTE shares. Petitioner agreed to a section 303 stock redemption and resolved to sell the classic cars to raise the necessary capital. The dealership hired a broker and sold approximately 69 classic cars during 1999 and 2000, the years at issue.

---

[7](...continued)
property as a museum allowed the dealership to recoup some of the overhead costs for maintaining and storing the cars, while still holding them for sale. The museum was open to the public from 1989 through 1999.

[8]The dealership sold a total of 11 vehicles and made 6 trades prior to the years at issue.

The dealership accounted for the new, used, and classic cars consistently. Every car was treated as inventory and assigned an individual stock number. Costs associated with the purchase and restoration of the classic cars were posted to the car's stock number, which allowed a running total of the dealership's cost basis in each car. The dealership did not deduct any costs as they were incurred, nor did the dealership depreciate any of the cars. No part of the dealership's cost basis in any classic car was recognized except when the car was sold or disposed of. The dealership included the sales price of the car, whether new, used, or classic, in the dealership's gross receipts and included all accumulated costs of each specific car in the costs of goods sold.

Whenever a car was sold, whether new, used, or classic, the dealership reported the gain or loss on the sale at ordinary income rates. For all years prior to the years at issue, the dealership reported sales on 11 classic cars at ordinary income rates. During the years at issue, the dealership reported sales on 69 cars, also at ordinary income rates.[9]

---

[9]For example, the dealership acquired the 1939 Packard in 1989, sold it for $330,000 in 1990, and had total accumulated costs of $160,260. After paying a commission on the sale of $26,400, the dealership reported an ordinary gain of $143,340 on its tax return for the tax year ended June 30, 1991.

Petitioner timely filed its Forms 1120, U.S. Corporation Income Tax Return, for 1999 and 2000, reporting the losses at issue. Upon examination of those returns, respondent issued a Notice of Deficiency to petitioner on February 25, 2003, determining that the classic cars were held for investment purposes and should be accorded capital loss treatment, not ordinary loss.

Petitioner filed a petition contesting respondent's determination and argued that the classic cars were held for sale and should be accorded ordinary income treatment. We must therefore determine whether the losses from the sales of the classic cars are ordinary or capital losses.

OPINION

We are asked to decide whether the dealership held the classic cars for investment or for sale. If the dealership held the classic cars as capital assets for investment, then we must sustain respondent's determination.[10] Conversely, if the

_____

[10]A "capital asset" is broadly defined as property held by the taxpayer, whether or not connected with his trade or business, subject to a number of exceptions. Sec. 1221(a). These exceptions include stock in trade, property of a kind that is properly included in a taxpayer's inventory, and property held primarily for sale to customers in the ordinary course of a taxpayer's trade or business. Sec. 1221(a)(1).

The U.S. Supreme Court has defined "primarily" as used in sec. 1221(1) to mean "principally" or "of first importance." Malat v. Riddell, 383 U.S. 569, 572 (1966); Biedenharn Realty Co. v. United States, 526 F.2d 409, 422-423 (5th Cir. 1976). The

(continued...)

dealership held the classic cars for sale to customers, then we must find for petitioner.  We begin with who has the burden of proof.

A.  Burden of Proof

The Commissioner's determination in the notice of deficiency is generally presumed to be correct, and the taxpayer bears the burden of proving otherwise.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  If a taxpayer introduces credible evidence with respect to a factual issue relevant to ascertaining the taxpayer's tax liability, however, the burden shifts to the Commissioner with respect to that issue, assuming the taxpayer meets certain other requirements.[11]  Sec. 7491(a)(1).  The burden of proof does not shift unless the taxpayer has complied with the substantiation requirements, maintained required records, and cooperated with the Commissioner's reasonable requests for witnesses, information, and meetings.  Sec. 7491(a)(2)(A) and (B).  The taxpayer has the burden of establishing that each requirement of section 7491(a)(2) has been met.  Higbee v. Commissioner, 116 T.C. 438 (2001).  Respondent concedes that

---

[10](...continued)
question whether property is held primarily for sale to customers in the ordinary course of one's business is "purely factual." Pritchett v. Commissioner, 63 T.C. 149, 162 (1974).

[11]Sec. 7491(a) applies to examinations commenced after July 22, 1998, and therefore applies to this case involving tax years 1999 and 2000.

petitioner has met the cooperation and substantiation requirements, but argues that petitioner has not met the credible evidence requirement.  We disagree.

Credible evidence means the quality of evidence the Court would find sufficient upon which to base a decision on the issue if no contrary evidence were submitted.  See H. Rept. 105-599, at 240-241 (1998), 1998-3 C.B. 747, 994-995; see also Blodgett v. Commissioner, 394 F.3d 1030 (8th Cir. 2005), affg. T.C. Memo. 2003-212; Edwards v. Commissioner, T.C. Memo. 2005-52.

Petitioner introduced evidence with respect to the factual issue in the case, through witness testimony and business records of the dealership, sufficient, in the absence of contrary evidence, to prove by a preponderance of the evidence that the classic cars were inventory held primarily for sale to customers in the ordinary course of business.  Specifically, petitioner produced evidence that it advertised the classic cars for sale, sold a substantial number of classic cars, and consistently reported the sales at ordinary income rates and consistently treated the classic cars as inventory on its corporate books.  We find this evidence credible as to the factual issue in dispute and thus sufficient to shift the burden to respondent under

section 7491 to prove the classic cars were held as an investment and subject to capital treatment.[12]

B.  Williford Factors

Our Court generally uses a number of factors to determine whether property is held for investment or held for sale.  See Williford v. Commissioner, T.C. Memo. 1992-450.[13]  In Williford, we examined whether a taxpayer's art collection was held primarily for sale to customers in the ordinary course of business.  The taxpayer in Williford was a part-time art dealer

_____

[12]Petitioner also argues that respondent must abide by Rev. Rul. 75-538, 1975-2 C.B. 35, which presumes that a taxpayer engaged in the trade or business of selling motor vehicles holds its vehicles primarily for sale, and not as an investment.  We find it unnecessary to address Rev. Rul. 75-538, supra, because we find that the evidence favors petitioner's position as to the character of the classic cars, irrespective of the presumption.

[13]Other courts use similar factors to determine whether property is held for investment or for sale.  For example, the Court of Appeals for the Fifth Circuit, where appeal will lie, uses the following factors:  (1) The nature and purpose of the acquisition of the property and the duration of the ownership; (2) the extent and nature of the taxpayer's efforts to sell the property; (3) the number, extent, continuity and substantiality of the sales; (4) the extent of subdividing, developing, and advertising to increase sales; (5) the use of a business office for the sale of the property; (6) the character and degree of supervision or control exercised by the taxpayer over any representative selling the property; and (7) the time and effort the taxpayer habitually devoted to the sales.  United States v. Winthrop, 417 F.2d 905, 909-910 (5th Cir. 1969) (citing Smith v. Dunn, 224 F.2d 353, 356 (5th Cir. 1955)); see also Howell v. Commissioner, 57 T.C. 546, 554 (1972) (six factors); Maddux Constr. Co. v. Commissioner, 54 T.C. 1278, 1284 (1970) (nine factors).  The factors are usually used to classify real estate. In Williford v. Commissioner, supra, the factors were used to classify artwork.  We have found no cases where the factors were used to classify cars.

and bought some paintings for resale and others for investment. The taxpayer kept separate his private art collection and the paintings for resale. The taxpayer classified the paintings in his private collection as capital assets and reported capital gains on the sale of these paintings. The Commissioner objected to the capital treatment, arguing that the taxpayer was an art dealer and derived the sales proceeds in the ordinary course of business. The Tax Court agreed with the taxpayer and held that the paintings were capital assets held for investment.

The Court used eight factors to analyze whether the art collection was held primarily for sale to customers in the ordinary course of the taxpayer's trade or business. The eight factors are: (1) Frequency and regularity of sales; (2) the substantiality of sales; (3) the duration the property was held; (4) the nature of the taxpayer's business and the extent to which the taxpayer segregated the collection from his or her business inventory; (5) the purpose for acquiring and holding the property before sale; (6) the extent of the taxpayer's sales efforts by advertising or otherwise; (7) the time and effort the taxpayer dedicated to the sales; and (8) how the sales proceeds were used.[14] <u>Williford v. Commissioner</u>, <u>supra</u>; see also <u>Bramblett v.</u>

_____

[14]Petitioner and respondent both deem the last factor inconclusive and not relevant, and we therefore do not address it. Generally, this factor indicates that assets are held for sale where the taxpayer uses sales proceeds to replenish

(continued...)

Commissioner, 960 F.2d 526 (5th Cir. 1992); Suburban Realty Co. v. United States, 615 F.2d 171 (5th Cir. 1980); Biedenharn Realty Co. v. United States, 526 F.2d 409 (5th Cir. 1976). We apply these factors to determine whether the dealership held the classic cars for investment or for sale.

1. Frequency and Regularity of Sales

The frequency and regularity of sales are among the most important factors in determining whether an asset is held for investment or as inventory. Suburban Realty Co. v. United States, supra at 176 (cited by Williford v. Commissioner, supra); see also Biedenharn Realty Co. v. United States, supra at 416; Buono v. Commissioner, 74 T.C. 187, 199 (1980); Goldberg v. Commissioner, 223 F.2d 709 (5th Cir. 1955) (frequency of sales alone is not sufficient to establish a taxpayer is engaged in selling assets as a business). The inference, generally, is that frequent sales serve as an indicium that the assets are being held for sale, while infrequent sales serve as an indicium that the assets are being held for investment.

Whether the number of sales was sufficiently frequent must be viewed in the context of the particular industry at issue.

---

[14](...continued)
inventory. See Williford v. Commissioner, supra (citing Bittker & Lokken, Federal Taxation of Income, Estates and Gifts, par. 51.2.3, at 51-18, par. 51.2.4, at 51-23 (2d ed. 1990); Ross v. Commissioner, 227 F.2d 265, 268 (5th Cir. 1955); and Goldberg v. Commissioner, 223 F.2d 709, 713 (5th Cir. 1955), revg. 22 T.C. 533 (1954)).

Respondent and petitioner have provided us with no caselaw concerning the sale of classic cars, or cars in general, but rather have highlighted cases concerning sales of real estate and artwork.[15] Each case turned on the unique facts at issue, and we can discern no standard from the caselaw to apply here. We therefore view the frequency of sales factor in the context of our own facts and apply no standardized test to determine whether the sales were sufficiently frequent.

Petitioner sold 80 cars over approximately 12 years.[16] The parties focus on different time periods to support their arguments. Petitioner focuses upon the higher number of sales in the years at issue to argue that the cars were held for sale as inventory. In contrast, respondent focuses upon the smaller number of sales between 1989 and 1998 to argue that the cars were held for investment purposes. The holding purpose inquiry begins at the time the property is acquired and spans the entire course

---

[15]Real property was held for sale where the taxpayer sold 37 lots in 3 years, and 10 lots in 2 years. See Biedenharn Realty Co. v. United States, 526 F.2d at 416; Thompson v. Commissioner, 322 F.2d 122, 124-125 (5th Cir. 1963), affg. in part and revg. in part 38 T.C. 153 (1962). Artwork was held for investment where the taxpayer sold eight paintings in 2 years. See Williford v. Commissioner, supra.

[16]The dealership owned more than 80 classic cars during the time that the museum was open.

of ownership.[17]  Suburban Realty Co. v. United States, supra at 183.

We first note that sales increased in the years at issue for understandable reasons.  Mr. Taylor died unexpectedly at age 60, and petitioner's board agreed to redeem the shares of DTE under section 303 that Mr. Taylor owned before his death.  The increase in sales does not negate a finding that the cars were previously held for sale.  Petitioner explains that the dealership sold fewer classic cars in the earlier years because it was in the nascent phase of building inventory, restoring the cars, establishing a reputation, and publicizing the classic cars to potential clientele, but that the cars were nonetheless held for sale at all times.[18]  We found testimony for the dealership compelling, and find the total number of sales, 80 sales over 12 years, and 69 sales over the 2 years at issue, sufficiently frequent to support a finding that the classic cars were held for sale.  This factor favors petitioner.

---

[17]We also note that we need not decide the "precise moment" that the cars were held for sale under Fifth Circuit caselaw. See Suburban Realty Co. v. United States, 615 F.2d 171, 184 n.36 (5th Cir. 1980).

[18]Specifically, four were sold in 1990, three were sold in 1991, three were sold in 1997, one was sold in 1998, and the remainder were sold in 1999 and 2000.

2. Substantiality of Sales

Courts generally view frequent sales generating substantial income as tending to show that property was held for sale rather than for investment. Suburban Realty Co. v. United States, supra at 181; Biedenharn Realty Co. v. United States, supra. Where substantial profits result from capital appreciation, however, and not from the taxpayer's efforts, infrequent sales generating large profits tend to show that the property was held for investment. Williford v. Commissioner, T.C. Memo. 1992-450 (citing Bramblett v. Commissioner, supra).

While the cars in this case appreciated in value, most of the gains from the sales were due to the dealership's efforts in restoring and refurbishing the cars. Further, the dealership consistently sold the classic cars before the years at issue for a profit, with the exception of two sales. The dealership reported all sales at ordinary income rates, as it did for sales of new and used cars. This factor favors petitioner.

3. Duration of Ownership

Longer holding periods suggest an asset is held for investment. See Williford v. Commissioner, supra. The Court in Williford found that holding periods of 19 years and 13 years served as indicia that the paintings were held for investment. The classic cars in this case were held 7 to 10 years. Of the classic cars sold prior to the years at issue, seven were held

less than 2 years, one was held less than 4 years, and one was held less than 10 years.  None of the classic cars were held for as long as the periods set forth in <u>Williford</u>.

Moreover, in <u>Williford</u>, the paintings did not require work akin to the extensive time and effort the dealership devoted to refurbishing and restoring the classic cars.  The attendant length of ownership is therefore longer in the case of value-added classic cars.  In comparison, the dealership's new and used cars were held shorter periods for readily apparent reasons.  Respondent's argument comparing the shorter periods for the new and used cars vis-a-vis the classic cars, therefore, is not dispositive.

The value of the new and used cars, as petitioner explained, depreciated quickly, demanding quicker turnover.  In contrast, the classic cars appreciated in value over time and, consequently, did not necessitate the same rapid turnover period.  We find, therefore, that the holding period for the classic cars is consistent with finding the dealership held the classic cars for sale.  This factor favors petitioner.

4.  <u>Segregation of Classic Cars From New and Used Cars</u>

Property held for sale and property held for investment must be separately identified.  <u>Scheuber v. Commissioner</u>, 371 F.2d 996, 998-999 (7th Cir. 1967), revg. T.C. Memo. 1966-107 (cited by <u>Williford v. Commissioner</u>, <u>supra</u>); <u>Frank H. Taylor & Son, Inc. v.</u>

Commissioner, T.C. Memo. 1973-82 (cited by Williford v. Commissioner, supra). This factor suggests property segregated from other property may indicate some assets are held for investment while others are held for sale.

In Williford, the Court found that the paintings held as inventory were kept in a location separate from those held for investment. While the classic cars were physically segregated from the new and used cars, we find the physical segregation of the cars of no moment. A dealership could have numerous physical locations. The fact remains that the classic cars were on display to the public at all times in contrast to the paintings the taxpayer held in his home that were not on display to the public. Moreover, the classic cars were held separately in buildings on the Galveston property because they required protection from the elements, unlike the new and used cars.

Nor do we find segregation of the cars for book purposes significant. Petitioner explained that it grouped the classic cars as "other assets" because "current assets" were those that could be converted to cash within a year. Because the classic cars were not typically sold within a year, they were listed under "other assets." This method is consistent with generally accepted accounting principles.

Overall, we do not find the segregation of the dealership's classic cars relevant to our determination whether they were for investment or for sale.  We therefore find this factor neutral.

5.  Purpose of Acquisition

This factor relates to whether the taxpayer intended to hold the property for sale or to hold the property for investment. Williford v. Commissioner, supra.  Respondent argues that the dealership's application for "exhibition" license plates indicates that the dealership did not hold the classic cars for sale.  Instead, respondent argues that the exhibition plates essentially meant the classic cars were not for sale.  As petitioner countered, the exhibition plates did not restrict the cars from being sold but merely were a means of informing the public that the classic cars were at least 25 years old.

Respondent also argues that the dealership acquired the classic cars to hold them for investment because Mr. Taylor was "passionate" about cars in general and classic cars in particular.  Testimony established that every classic car the dealership owned was acquired so it could be sold for a profit. We do not find it relevant whether Mr. Taylor was passionate about classic cars.

The dealership's accounting treatment of the classic cars was no different from the new or used cars.  Each car, whether new, used, or classic, was assigned a stock inventory number.

Any costs associated with the car were added to the basis of that car, and no depreciation or current deduction was claimed. The dealership reported each car sale, whether new, used, or classic, as a sale of inventory at ordinary income rates. See Daugherty v. Commissioner, 78 T.C. 623, 630-631 (1982) (an important way of determining the taxpayer's intent in holding the property is how the property was handled on the taxpayer's books and records). That the dealership reported sales at ordinary income rates in the 10 years prior to the years at issue and consistently held the classic cars out to third parties as inventory bolsters its argument that its purpose was to hold the cars for sale.

Further, we cannot accept respondent's assertion that the primary holding purpose of the classic cars was merely to exhibit them as "museum pieces". We question whether the dealership would expend effort to acquire, rebuild, and maintain the classic cars if the purpose were merely to display them, stationary, at a museum. On the contrary, each car was rebuilt to near perfection, and the dealership maintained standards so that each car could be driveable at any time and therefore command the highest price. The dealership started the car engines every 6 weeks and changed the oil every 6 months to maintain them in driving condition. Designating the Galveston property as a museum made business sense as a means to gain exposure for the

classic cars specifically and the dealership in general, and to cover overhead.

We found the testimony that the classic cars were acquired as inventory to be honest, forthright, and credible. This factor favors petitioner.

6. Sales and Advertising Effort

Sales and advertising efforts indicate the assets are held for sale, not investment. Respondent argues that the dealership did not advertise the classic cars for sale and compares the advertising strategies the dealership used to market the new and used cars with the less overt methods the dealership used to market the classic cars. Again, we find this analogy artificial. The holding period was shorter for new and used cars, and the advertising methods consequently more immediate. The dealership could be selective in its sales so long as its activity was consistent, overall, with its treatment of the classic cars as inventory for sale.

Petitioner argues that the dealership used various advertising methods to market the classic cars for sale. These included entering the cars in auctions and auto shows, displaying the cars at numerous events frequented by wealthy individuals, hosting events at the Galveston property for wealthy car enthusiasts, designing and printing brochures featuring the cars, arranging for newspaper and magazine articles about the cars,

displaying the cars at the dealership and promotional events, and publishing a large booklet on the cars. Personnel of the dealership testified that they referred serious inquiries regarding the classic cars to Mr. Taylor, or to a broker retained by the dealership after Mr. Taylor died. There was also testimony that Mr. Taylor was frequently on the Galveston property negotiating with interested buyers.

We find that the dealership always held the classic cars as inventory for sale. The dealership was merely more flexible regarding the classic car's price during the years at issue because of the immediate need for capital. In addition, we find that the dealership made efforts to advertise and sell the classic cars in years before those at issue. Mr. Taylor personally negotiated these sales, and he would often accompany potential customers on test drives of the cars. If a potential customer ever expressed an interest in a classic car, testimony established that personnel would direct the potential customer to Mr. Taylor or the broker appointed to sell the classic cars after Mr. Taylor's death.

Even though, as respondent contends, the dealership did not market the classic cars as it marketed the new and used cars, we find the record replete with evidence that the dealership held the classic cars as inventory for sale. Mr. Taylor frequently stated that every classic car was for sale. In fact, the dealership's general manager testified that Mr. Taylor said

everything was for sale for the right price. Testimony also indicates that Mr. Taylor rejected a suggestion to form a foundation to own the classic cars. Mr. Taylor rejected the suggestion when he learned that the profits from selling the classic cars would go to the foundation rather than the dealership. Mr. Taylor wanted the profits to flow to the dealership. This factor favors petitioner.

7. <u>Time Devoted to Sales Activity</u>

That a taxpayer devotes little time or effort to the selling of assets may suggest that the assets are held for investment purposes. <u>Williford v. Commissioner</u>, T.C. Memo. 1992-450. A taxpayer does not hold property for sale if the taxpayer did not initiate sales, advertise, have a sales office, or spend a great deal of time on the transactions. <u>Byram v. United States</u>, 705 F.2d 1418, 1424 (5th Cir. 1983); see also <u>Ross v. Commissioner</u>, 227 F.2d 265 (5th Cir. 1955) (taxpayer did not list property with real estate dealers, advertise, or make efforts to sell the property), revg. T.C. Memo. 1954-179.

We find that the dealership here devoted substantial time to the sales activity. This includes the time spent coordinating advertising and promotional events, and the time Mr. Taylor spent at classic car shows and auctions negotiating with potential customers, as well as the time the broker spent negotiating sales following Mr. Taylor's death. This factor favors petitioner.

C. <u>Conclusion</u>

The ultimate inquiry in this case is whether the classic cars were held primarily for sale. We find that they were. We find compelling the dealership's continuous and consistent treatment of the classic cars as held for sale. We also find testimony concerning the dealership's sales efforts credible and persuasive. From the date the dealership first acquired a classic car, the dealership has been in the business of selling cars. The dealership's classic cars were consistently treated for book purposes and tax purposes as held for sale. We surmise respondent now objects because of the ordinary losses generated by the sales in the years at issue. Respondent was apparently content to collect tax at ordinary income rates on gains from sales of the dealership's classic cars in prior years.

We have found that all of the pertinent factors favor petitioner or were neutral. The factors, however, are not dispositive, and each case must rest upon its own facts. The focus here is upon the statute, which excludes from capital asset treatment property held by the taxpayer primarily for sale to customers in the ordinary course of his or her trade or business. Sec. 1221(a)(1); see <u>Thompson v. Commissioner</u>, 322 F.2d 122, 127 (1963) (cited by <u>United States v. Winthrop</u>, 417 F.2d 905, 910 (5th Cir. 1969)), affg. in part and revg. in part 38 T.C. 153 (1962); <u>Wood v. Commissioner</u>, T.C. Memo. 2004-200.

Respondent had the burden to prove by a preponderance of the evidence that the classic cars were not held for sale.  He did not meet that burden.  We conclude that the dealership's classic cars were held for sale and hence qualify for an exception from capital asset status under section 1221(a)(1).  Accordingly, we do not sustain respondent's determination.

<u>Decision will be entered
for petitioner</u>.