William Eugene Monday, Jr. v. Commissioner. William Eugene Monday, Jr., and Florence S. Monday, Husband and Wife v. Commissioner.
Monday v. Commissioner
Docket Nos. 50918, 50919.
United States Tax Court
T.C. Memo 1957-1; 1957 Tax Ct. Memo LEXIS 252; 16 T.C.M. (CCH) 1; T.C.M. (RIA) 57001; January 2, 1957
*252 The operation by which petitioner sold defense housing units was in all important respects substantially equivalent to a business. Held: The gains from such sales are taxable as ordinary income. In each of the taxable years petitioner received, in addition to the sales price of the defense housing units sold upon which the net gain on sales involved in the principal issue were calculated, a partial return of amounts of so-called "escrow accounts," which amounts were not reported either as long-term capital gain or ordinary income when received. Held, that petitioner has failed to sustain the burden of proving error in respondent's determination that the return of said escrow refunds constituted the receipt of income within the purview of section 22(a) of the 1939 Internal Revenue Code. Howard F. Jarvis, Esq., Mercantile Building, Knoxville, Ky., Elliott D. Adams, Esq., and William O'Neil, Esq., for the petitioners. James R. Harper, Jr., Esq., for the respondent. FISHER
Memorandum Findings of Fact and Opinion These proceedings involve determinations of deficiencies in income tax in the amounts and for the years as follows: Docket No.
Year
Amount
50,918
1946
$ 67,535.70
50,918
1947
152,881.20
50,919
1948
38,446.41
50,919
1949
16,921.18
The *253 issues involved are (1) whether gains from the sale of so-called "defense housing" by the petitioner during each of the taxable years constituted ordinary income or capital gains, and (2) whether so-called "escrow funds" returned to the petitioner upon the sale of these properties were taxable and, if so, whether as ordinary income or capital gain. Findings of Fact The stipulated facts and supporting exhibits are incorporated herein by this reference. William Eugene Monday, Jr. (hereinafter referred to as petitioner) is a native and resident of Knoxville, Tennessee, and filed timely separate returns with the then collector of internal revenue for the district of Tennessee for the calendar years 1946 and 1947. Petitioner and his wife filed joint returns in the same venue for the calendar years 1948 and 1949. All returns were prepared on the cash basis. Petitioner was 51 years old at the time of the hearing in 1955, was married, and had three children. He was graduated from the University of Tennessee in the early 1920's and then went to New York City for schooling and his Master's degree. During the day he worked for a large New York real estate firm in its rental department and soon *254 went into his own real estate management business. He was licensed as a real estate broker and continued on successfully in New York. He invested substantially in securities. The stock market crash in the late 1920's took all of his accumulated savings except for a small fund of about $5,000. A short time thereafter, in 1931, petitioner returned to Knoxville, where he has since remained. There, he assisted in his father's real estate business for a while, and then gradually began to accumulate property of his own to hold and manage. These properties were almost entirely multipleunit residential (such as apartment houses, hotels and an old YMCA building) or commercial (such as office buildings, stores, filling stations, theaters, laundries, restaurants, a resort which included a large wooded area, cabins and a lodge and a coal mine). Approximately $84,000 worth had been acquired by 1938. Between 1938 and 1945, an additional $366,000 worth was acquired. The following further acquisitions, in round amounts (and exclusive of about $6,000 and $3,000 of claimed furniture and fixture capital expenditures disallowed by the revenue agent for 1947 and 1949, respectively) were made during the *255 taxable years: Year
Amount
1946
$134,000
1947
307,000
1948
154,000
1949
166,000 Substantially all of the aforementioned properties were on hand at the hearing of the instant cause. The following schedule reflects (in round amounts), for the taxable years involved, the net cash income (or loss) from these properties and the net taxable income (or loss) after a deduction for the non-cash item of depreciation: Net Cash
Net Income
Income
(or Loss) after
Year
(or Loss)
Depreciation
1946
$23,000
$ 5,000
1947
96
(25,000)
1948
(43,000)
(82,000)
1949
3,000
(43,000) Petitioner was not licensed as a real estate broker in Tennessee. In response to the national emergency in the early 1940's, so-called "defense housing" projects sprung up in critical areas under a Federally instituted program ("Title VI" of the National Housing Act), to accommodate priority occupants (e.g., war workers). Knoxville, with its nearby aluminum plant and other private and Governmental ("Oak Ridge") strategic operations, was such an area. A number of Federal agencies (the hereinafter mentioned "NHA," "FHA" and "OPA") administered the various phases of the housing program. In the middle and late 1940's, as veterans were returning to civilian life, *256 the program's emphasis was on providing them with adequate housing - to own or rent. Under the applicable controlling regulations of the National Housing Agency then in effect, two-thirds of the units in the Knoxville area were to be made available first for rental purposes to certain priority tenants (e.g., war workers) but could thereafter be disposed of by sale after a continuous two months' occupancy. One-third of all units placed under construction could be sold to war workers within 15 days of their completion and without first renting the units. This represented a general relaxation of the more restrictive regulations theretofore in effect [1] and held out the prospect of an early complete removal of holding for rent requirements. The rents were stabilized by the Office of Price Administration with ceilings on maximum rentals. The foregoing prior availability for rental requirements were lifted entirely in October 1945. The ceiling on rentals in the Knoxville area was maintained until September 1949. The housing involved was single-story *257 and generally of wood on cinder block foundatiions, with kitchen, dining room, living room, (11 1/2 inch X 16 1/2 inch), and two or three bedrooms (about 11 inch X 8 inch, 11 inch X 11 1/2 inch and 10 inch X 12 inch). They were equipped with an electric stove, refrigerator, space heater, and automatic water heater. Their retail sales price was about $5,000 to $7,000. Except for the plumbing and heaters, they were usually constructed with standard building materials. Prefabrication of the units also was not uncommon. Most of the dwellings were separate units, but some were so-called "duplexes" (two single-dwelling units with a common wall). The defense housing units were most often erected by large-scale building contractors or real estate developers who had aquired a tract of land, subdivided it into lots and brought in utilities, etc. To stimulate such development, the Federal Housing Administration upon application by the lenders, insured the mortgages executed by the developers under which the construction was financed. The developers usually sold what they could under the regulations to individual owners and then either themselves held the others for rental or disposed of them *258 wholesale. In selecting a "wholesale" purchaser, the main interest of the developer was that the obligations under the mortgages would not be defaulted, rather than the use to which the property was put. Upon default, the FHA would have to make good its insurance commitment and the chances would then be reduced that such builder would thereafter be able to get another project financed easily. Holding the units for rent was not a controlling factor in the selection or approval of petitioner by the developers as a wholesale purchaser of their defense housing. Petitioner made all of his purchases of defense housing units subject to the existing mortgages and did not become personally liable thereon. He was able to maintain an excellent credit rating at the local banks, and was a desirable purchaser. The existence of rental requirements and the OPA rental ceilings was considered as a factor in arriving at the wholesale price petitioner paid for defense housing in 1944 and 1945. None of petitioner's purchases of defense housing were financed for him by the FHA. The FHA was not authorized to make any specific approval of petitioner as a condition precedent for sale to him by the developers. *259 The FHA was not authorized to require petitioner to make sales of any or all the defense housing units he purchased. The FHA was empowered to require adequate repairs and maintenance of the defense housing units. Petitioner did not at any time become a contractor or developer. His wholesale purchases of defense housing in 1944 and 1945, and throughout the taxable period, 1946 to 1949, inclusive, (in at least 16 projects) from builders of newly developed projects or the unsold portion of established projects is reflected in Appendix A, infra. As the projects had already been financed and petitioner always bought subject to the mortgage, his cash outlay per unit was very small, ranging from $50 to $300, and it was not difficult to acquire expansive holdings. The so-called "investment basis" of these holdings (to be distinguished from the actual cash outlay) exceeded $3,000,000 at the close of each of the taxable years. Each defense housing project was managed for the petitioner by a real estate sales and management firm as his agent. They received a 3 per cent commission on rentals and a 3.5 per cent commisision on such sales as were authorized by petitioner. Petitioner's main efforts *260 during the taxable period were devoted to supervising the activities of his several real estate agents and managing his nondefense housing properties. Petitioner maintained offices both at home and in town for these purposes. As regarded rental management, the firms had their own maintenance crews, agents to collect the rents, officials to handle the payments of interest, taxes and other charges, office staff to keep accounting records for each project and render periodic financial reports with net cash remittances (or debit statements, where payments and costs in petitioner's behalf had exceeded rental receipts). The projects were actively advertised for rent in illustrated and classified newspaper ads. The agents also had rental "salesmen." Rentals were on a month-to-month basis and no written leases were issued. Petitioner kept in close contact with his agents in relation to vacancies and prospective tenants. He also assisted in the on-the-scene rental activity and with the preparation of brochures - each with map of the particular project's exact location, plat plan, and individual unit floor plan. The net cash income regularly provided by this defense housing rental operation *261 throughout the taxable period, before deduction of the noncash item of depreciation, and the depreciation amounts, are reflected in Appendix A, infra. The sale of units in petitioner's defense housing projects throughout the taxable period was conducted at the same time and in much the same way that the rental activities were being carried on. Only the agents who also handled his rentals were ever authorized to make sales in his behalf. The accounting records were maintained by the agent with reports and remittances being rendered periodically, as with the rentals. Petitioners' returns were prepared from these reports. Petitioner did not himself advertise his properties for sale. His real estate agents actively advertised some of his defense units for sale. The brochures above-mentioned, and hereinafter described, did not indicate that they were directed solely to rental prospects. They were foldout type announcements of "a community" of "MODERN HOMES" "situated on large landscaped lots" "well located in suburban North Knoxville" (or elsewhere in the Knoxville area), with a highly artistic illustration on the cover leaf, and listed among their "FEATURES": "Select Clientele," "Fully *262 Insulated," "Hardwood Floors," "Near Municipal Golf Course." In addition, classified and illustrated newspaper ads were regularly used. The illustrated ads placed in the daily newspaper covered entire projects. The classified ads related to specific units. The sales ads were similar to and ran concurrently with, although separate from, the rental ads. No "for sale" signs were placed on any of the units and no special listings were made by petitioner with his agents. As the same agent handled a project's sales as well as rentals, the agent knew in advance when a unit would be vacant, and that there was a possibility that sale of the unit would be authorized by petitioner. Third parties rather than existing tenants were the predominant source of purchasers. A lower than standard per unit sales commission was excepted by the real estate firms in view of the number of sales contemplated. The agents directed sales efforts to units as they became vacant during the taxable period, but all sales were subject to petitioner's final approval. Petitioner did not authorize the sale of all units which became vacant, but usually gave his approval to the sale of one unit when several became vacant. *263 The units that were going to be sold were given a special repair and redecoration job as compared with that given to rental units. With rare exception, no one unit or project was considered any more or less desirable by petitioner from long-term investment standpoint. The number of units sold in each of the taxable years is set forth in Appendix A, infra. The vacant units not approved for sale were rerented. Officials of the FHA and NHA urged petitioner on a number of occasions to sell a substantial number of his defense housing units. Their interest was in part attributable to the fact that the mortgages were insured by FHA and they were concerned about possible foreclosures and losses in the event the market dropped off. They felt that Monday was holding too many housing units. They also wanted to afford to returning veterans the opportunity to purchase homes. Petitioner's real estate agents likewise contacted him repeatedly and urged him to sell houses as they became vacant. Petitioner used the sales and rental proceeds to acquire additional properties, pay his carrying charges, furnish or refurnish some rental units, prepare others for sale and generally maintain and repair his *264 properties. No sales proceeds were earmarked for particular purposes. The net gains realized from the sales of defense housing throughout the taxable period are reflected in Appendix A, infra. All units sold were held longer than six months. A relative seller's market continued throughout the taxable period. The defense housing units sold during the taxable period were primarily held for sale to customers in the ordinary course of a trade or business then being carried on by petitioner. The administrative rules for war rental housing insurance under section 608 of the National Housing Act promulgated by the Federal Housing Administration and having a bearing on the second issue involved variously required that the insured mortgages should provide for such equal monthly payments by the mortgagor to the mortgagee as would amortize ground rents, if any, and the estimated amounts of all taxes, water rates, special assessments, if any, and fire and other hazard insurance premiums, within a period ending one month prior to the dates on which the same would become delinquent. The mortgages also had to provide that such payments (the so-called "escrow accounts" elsewhere referred to herein) *265 would be held in trust for the benefit and account of the mortgagor by the mortgagee, for the purpose of paying such ground rent, taxes, water rates, assessments, and insurance premiums, before the same became delinquent. Adjustments, in case the estimates exceeded or fell short of the actual amounts due, were also to be provided for. [2]
When Monday acquired defense housing property, he paid over to the mortgagee, in addition to the purchase price negotiated with the seller thereof, an amount equal to the escrow account which had been accumulated by the mortgagee in behalf of the mortgagor, as described above, but was not yet due. The amount of such payment was treated by Monday in the preparation of his tax returns for the year in which the payment was made as an expense deduction against rental income from such property during that period. The payments were treated separately from and were not reflected as part of the cost basis of such properties. Thereafter, as petitioner's agents took over the management of the various defense properties, they continued to make the required payments to the escrow account *266 in the mortgagee's hands and treated such payments wholly as current expense deductions in computing the net cash rental income (or deficit) statements prepared for Monday and upon which his tax returns were based. When Monday sold defense property he would receive, in addition to the selling price negotiated with the purchaser, a refund in the amount of the accumulated escrow account then held by the mortgagee from the payments made by petitioner's agents. Such amounts were not included as income on Monday's returns for the period in which received nor otherwise treated as part of the selling price of the property, and did not enter into any calculation of the gain upon such sales. The refunded escrow amounts were excluded from income or gains calculations by the accountants simply upon the understanding or representation to them, upon the basis of a general estimate, that such amounts merely balanced off the amounts originally paid over when the property was acquired. The amounts of the refunded escrow accounts in issue for each taxable year are as follows: 1946
$ 581.38
1947
18,581.67
1948
14,543.08
1949
7,978.27
APPENDIX A The following schedule reflects in summary fashion petitioner's *267 dual rental and sales activities with regard to defense housing during the taxable period: Net Rental
Units
Units
Net Gain
Income Before
Year
Acquired
Sold
on Sales
Depreciation
Depreciation
1946 *
146
154
$162,000
$127,000
$170,000
1947
53
201
325,000
62,000
147,000
1948
87
114
211,000
63,000
131,000
1949
5
66
129,000
55,000
119,000
Opinion FISHER, Judge: I. A resolution of the primary issue involved is dependent upon the determination of whether the defense housing units sold during the taxable period were held primarily for sale to customers in the ordinary course of a trade or business then being carried on by petitioner. Internal Revenue Code of 1939, section 117(a)(1), (j)(1), (B). The respondent determined that they were. Petitioner challenges the determination, claiming that he was in the business only of renting defense housing and that the sales in question constituted not a business, but a liquidation of his investment in defense units used in that business. The question to be decided is essentially one of fact. Dougherty v. Commissioner, 216 Fed. (2d) 110 (C.A. 6, 1954); D. L. Phillips, 24 T.C. 435. The *268 burden of proof is upon the petitioner to show that the respondent's determination is erroneous. Alice E. Cohn, 21 T.C. 90 (1953), affirmed 226 Fed. (2d) 22, (C.A. 9, 1955). Certain judicial tests have in time been developed which may be applied in assessing the evidence in each case. Among these, no one of which is determinative, are: The extent of the seller's activity or "busyness" (viz., whether it constituted an occupational undertaking to which the seller normally devoted effort, time and attention with substantial regularity); the extent to which the owner or his agents engaged in sales activities by improving the property, soliciting customers, and advertising; if conducted through representatives, the character and degree of supervision or control exercised over the representative; the continuity of sales or sales related activity over a period of time; the number and frequency of sales; the substantiality of sales proceeds as compared with proceeds of other income-producing activities. See Charles E. Reithmeyer, 26 T.C. 804 (July 11, 1956); Boomhower v. United States, 74 Fed. Supp. 977. Another important factor tending to establish the existence of a trade or business *269 as opposed to a mere liquidation, and that sales were made in the ordinary course of such trade or business, is the making of further or additional acquisitions of like properties during the period in which sales of such properties are being made. Albert Winnick, 21 T.C. 1029 (1954), affirmed 223 Fed. (2d) 709 (C.A. 6, 1955). See also Goldberg v. Commissioner, 223 Fed. (2d) 709, 712-713 (C.A. 5, 1955, reversing 22 T.C. 533). While the original intent or purpose underlying the acquisition of the property sold is of importance, the more crucial and significant factor is the intent with which it is held at the time of sale. Albert Winnick, supra; Walter R. Crabtree, 20 T.C. 841 (1953). In this regard, it is entirely possible that a dual purpose (such as both rental and sale) may govern with respect to the same properties at any given time, and such dual business roles have been recognized. D. L. Phillips, supra.The fact that houses were rented prior to sale does not establish that at the time of sale they were held primarily for investment and, conversely, is not necessarily inconsistent with a purpose to then hold primarily for sale. Alice E. Cohn, supra; Dougherty v. Commissioner, supra. *270 The following pertinent statement was recently made in Goldberg v. Commissioner, supra, at p. 712: "In the typical case it is clear that the property owner did not intend to engage in the business of buying and selling real estate when he acquired or developed it, but on the contrary intended only to rent it. At the time he may have been restrained from selling by wartime legislation * * *. But years later, his intention changes or the government restrictions are removed, and he proceeds to sell the property. The test as to whether the capital gain provisions apply in such event is, at bottom, whether the purpose of the sales is primarily making money by carrying on a substantial part of the activities of a person engaged in the business of selling houses, or to dispose of or liquidate the rental business. * * * "* * * If the property was originally acquired for rental purposes, it may nevertheless later be held for ordinary business sale to customers; * * *" In our opinion, petitioner has failed to meet the burden of proving error in respondent's determination. Rather, we are satisfied that petitioner was, in fact, simultaneously engaged in the dual business operations of sale as *271 well as rental of defense housing units throughout 1946 to 1949, inclusive. Accordingly, we affirm the respondent's determination that the defense housing units sold were not capital assets and the profits realized upon their sale are properly to be taxed as ordinary income. The very singular factual background involved in the instant case readily distinguishes it from others heretofore considered in which a disposition of defense housing units or other property as capital assets was involved. On the other hand, the similarity of critical operative facts in prior cases where the disposition of defense housing units or other property was found and held by this and other courts to constitute a business, with those herein, is readily apparent. We think that the tests variously applied in prior cases, (e.g., "busyness" of the seller or those acting under his supervision and control; substantiality of the income derived as compared with income derived from other sources; and frequency and continuity of the operation, etc.) are, upon the facts, hereinafter set forth in their more essential details, persuasive of the correctness of respondent's position. As reflected in our Findings of Fact, *272 petitioner acquired large holdings of defense housing units in the middle 1940's (largely in 1945), shortly before any remaining restriction as to the sale thereof was entirely removed on October 15, 1945. The trend toward relaxation thereof had already begun and the prospect of their complete, early removal was promising. (Even while the restrictions were in effect, their prohibition against sale was limited to two-thirds of the units in the particular project.) Rental ceilings, however, were maintained substantially throughout the taxable period (until September 1949), making sales more lucrative than rentals. The housing units were of a type and at a price readily attractive to a returning veteran, or anyone else settling in the area, interested in owning his own home. It is clear from the evidence that after petitioner acquired the properties, although all sales were subject to his final approval, a practical understanding existed between petitioner and his management agents that when several units became vacant, he would approve the sale of one of them. As units in different projects were being sold, other projects were being acquired. No one project, with rare exception, was *273 more desirable than any other to retain solely for rental purposes. Petitioner's agents accepted a lower than standard sales commission in anticipation of the opportunity to sell a minimum of 10 to 15 properties. Such agents advertised the sale of units in the newspapers at the agent's expense and made active efforts through their salesmen to sell such properties. Because of a seller's market, there was no difficulty in making sales. Books and records for the rental and sales operations were kept by the agents and periodic reports with consolidated net remittances were sent to petitioner. The rental operation regularly provided significant net cash receipts and petitioner's credit status with local lending institutions was excellent. None of the sales operation's earnings and profits were earmarked and sales receipts were variously devoted - along with net cash rentals - to such uses as paying carrying charges, repairs and maintenance, and acquisition of new defense housing units or still additional nondefense housing properties. This pattern continued throughout the four years in question. 154 units were sold in 1946, 201 in 1947, 114 in 1948, and 66 in 1949. Sales net gains were *274 127 per cent, 520 per cent, 333 per cent, and 236 per cent of net cash rental receipts (before deduction of depreciation) for 1946, 1947, 1948 and 1949, respectively, with regard to defense housing. In comparison with nondefense property net cash rentals during the taxable period, gains on sales of defense housing were even more substantial. It is our opinion that Congress intended such regular activities, conducted with all the essential incidents of a trade or business, and the income produced therefrom, to be excluded from coverage within the heretofore mentioned sections (the so-called "capital asset" provisions) of the Internal Revenue Code. In support of his contention to the contrary, and particularly on the issue of intent, petitioner urges that he has always regarded himself as an investor in real estate, and that he has repeatedly held himself out as such. We agree that one important aspect of his business was that of an investor. The point is that that was not his sole business. He was, we think, operating in more than one capacity, and when the circumstances suited his purposes, he sold a large number of properties, by individual sales, as a part of a regularly conducted *275 business, in which he followed a consistent pattern over a period of more than four years. We think that there can be no doubt that once the restrictions on sales were removed (October 1945) petitioner definitely adopted the policy (known to his agents by his conduct and contacts with him) of selling some proportion of houses which became vacant. It is clear that this was not a liquidation, because during the same period he was continually buying more. He paid a sales commission to his agents which was fixed in practice, and the agents recognized the course of dealings by paying money out of their own pockets for advertising because they knew and understood that in the normal course a number of properties would be available for sale. As a basis for holding that the houses were held primarily for sale to customers in the ordinary course of business, it is not necessary to hold that petitioner was willing to sell all or most of his houses. He bought a great many of them and held a substantial number, but also sold a substantial number. Even though he did not designate either specific houses or a specific number of houses to be available for sale, he did, as indicated by his conduct, *276 let it be known to his agents that a number of houses would be sold from time to time when vacant. This leads to the conclusion, under all of the surrounding circumstances, that those which he did sell, he, at the time, held primarily for sale in the ordinary course of business. Petitioner also urges that he sold only because of pressure by FHA and NHA officials, and the importunities of his agents. He insists that he sold reluctantly. We do not doubt that the officials attempted to put some pressure on him to sell, but the fact that he continued to buy units in large numbers in addition to selling many satisfies us that such pressure was not a dominating factor inducing the sales that were made. Moreover, it is clear that such officials had no power to make him sell. As to his agents, it would have been remarkable if they had not urged him to sell in a seller's market where easy commissions were in sight. If he had not been willing to sell, a short and consistent answer of "no" would have solved the problem. As to petitioner's claim that he was reluctant to sell, we again agree that he was reluctant to sell in the quantities urged by the FHA, NHA, and his own agents, who, no doubt, *277 would have been happy if he had sold all of his holdings. The practical fact that he sold 535 units over a four-year period, or an average of over 2 1/2 units per week would hardly indicate that the reluctance was deep-seated. We pass lightly over petitioner's eloquent testimony to the effect that he was investing merely to build up a "nest egg" for his family. Whether as a repository of his profits from sales or as a holder of the properties he owned, the nest which would contain them must needs have been a large one. We also find no support for petitioner's contention in the fact that (1) no "for sale" signs were placed upon the property; (2) no "for sale" listings were maintained by petitioner with his agents; (3) sales advertising was not in petitioner's name; (4) the spread between rental ceilings and costs was very low; (5) petitioner did not accept all offers to buy his defense housing units and could have sold out; and (6) an accountant advised petitioner regarding the consequences of sales of "capital assets." We may briefly dismiss the first three items. It is clear that "for sale" signs were not necessary to sell the houses because of the demand. "Listings" were not necessary *278 because each managing agent made all of the sales in the particular project under his jurisdiction; knew from his knowledge as agent which properties were vacant; and further, knew by custom that when several properties were vacant, petitioner would permit the sale of one of them after contact by the agent and appropriate request. None of the agents had any need to fear competition from outside agencies which did not have the management of the property. The fact that the sales advertising was not in petitioner's name, but was in that of the agent, is merely representative of the normal course of business when property is being managed by an agent and the same agent is to make the sale (or for that matter, negotiate a rental agreement). We turn next to the fourth item. While the low spread between OPA fixed rentals and costs serves as one good reason why petitioner's defense housing units were regularly held for sale to customers, as well as rental, during the taxable period, we do not feel that it also requires or supports petitioner's characterization of his selling operation as a forced liquidation of assets used in the rental business. The point petitioner wishes to make is that *279 it was out of financial necessity that any units were sold. The simplest answer to this is apparent from our Findings of Fact wherein it is clearly reflected that petitioner's defense housing rental operation yielded significant net cash receipts after deduction by the agents for all cash expenditures throughout the taxable period. This picture would not be changed even if at some interval during the year the rents from some projects were not sufficient to meet expenditures. The negative figures resulting after the deduction of the non-cash item of depreciation fail to indicate a need for liquidation, and it is clear that there was in fact no liquidation. Moreover, it is likewise evidence that petitioner's credit standing was excellent in view of the fact that he did not assume any defense housing mortgages, and that his sales operations were providing substantial earnings that could be and were availed of for any purpose. We also note that petitioner did not save himself the cost of a repair job by selling a unit. It was the practice to do a special job on units to be sold. It is also significant, as we have already mentioned, that while petitioner was selling defense housing units *280 he was acquiring additional defense housing projects. From all the foregoing, we conclude that the regular holding out of vacant defense housing units for sale to customers throughout the taxable period cannot be characterized in any sense as forced by financial necessity. Examination of the figures would indicate rather that selling, at least during the period in question, was a more profitable business than renting. That petitioner did not accept all offers to buy defense housing units merely reflects the double aspect of his business and indicates his expectation that the rental business would eventually improve with consequent greater future profits to be anticipated from this source. With rental ceilings lifted, it is clear that petitioner's competitive position in a rental market (having bought cheaply) would be excellent. In any event, we think that his refusal to sell some units while selling others does not alter the fact that the manner in which the selling operation was conducted did, itself, constitute a business and reflected business judgment and decision. Without necessary elaboration, we recall our earlier observations, pertinent here as well, that reluctance to sell *281 was not an unwillingness to sell at all, but rather an unwillingness to sell in the numbers urged upon him. The concept of liquidation, again, is answered by the fact that while units were being sold, a large number were being purchased. Also significant here is the fact that petitioner was steadily building up his other residential and commercial holdings - the rental of which had regularly provided his income prior to the war period - and maintaining them intact all the while he was buying and selling, or renting, defense housing. We do not view petitioner's consultation with his accountant, or the advice he received, as of any consequence in resolving the issue before us or in any way favorable to petitioner's contention. Because petitioner was advised, in general, as to the more favorable tax consequences flowing from a mere liquidation or sale of "capital assets," and would have liked to receive such favorable treatment, does not mean that he did not, as we have found, so conduct his affairs as not to be entitled thereto. The accountant testified that he was consulted before the selling operation was launched and was not aware of how many units petitioner was selling, had sold, *282 or intended to sell. The significance, if any, of the consultation is that it evidences the fact that petitioner had in mind making sales in sufficient quantity to render the tax factor one to be reckoned with. We turn next to an assertion of the petitioner repeated throughout the course of these proceedings and predicated upon his own testimony - viz., that most of his time was spent attending to rental matters. As our Findings of Fact show, petitioner rented extensive commercial and multiple-dwelling residential properties as well as the so-called defense housing. The record indicates that petitioner's direct and substantial personal attention to rental management matters was concerned with these nondefense properties. But, with regard to his defense housing, as the facts emerge from the record, it clearly appears that rental and sales were carried on in much the same way - viz., by on-the-scene agents whose activites in both areas were coordinated and supervised by petitioner. There is no basis in the record for an allocation of time as between rental and sales spent by petitioner on defense housing units, but assuming that most of it related to rentals, there appears to be no doubt *283 that he gave to sales whatever of his time was required. It can hardly be suggested, on the record, that he treated lightly the sale of so many units, with so much money involved. Clearly there were two well defined but closely interrelated business activities (rental and sale). Whatever the relative amount of time spent on each, the factors of "busyness" were present in each and were significant. Finally, we do not think that the existence of NHA regulations requiring a prior holding for rental at the time petitioner made his initial and most substantial purchases of defense housing units fixes an exclusive intent to so hold them for rental when they were acquired, or, certainly, the purpose for which they were held at the time the sales were made. We have already had occasion to comment as to the limited nature of these requirements, the trend of relaxation already in swing by that time, and their complete removal prior to the start of the taxable period. We think that the record affords ample basis for the determination that at the time the houses here involved were sold, the quantity and consistency of such sales and the manner in which the sales operation was conducted by petitioner *284 demonstrates that the houses sold were primarily held for sale to customers in the ordinary course of a trade or business then being carried on. The existence of large numbers of units at the close of the taxable period does not detract from or vitiate the realities of events which transpired throughout the entire course of that period, but does, on the other hand, tend to contradict the contention that petitioner was merely engaged in a process of liquidation. II. The respondent determined in his notice of deficiency, with respect to the refunded amounts received by petitioner from the mortgagee's escrow accounts, that since those amounts were set aside out of payments by petitioner and deducted by petitioner in determining net income, they represented when received amounts includible in income within the purview of section 22(a) of the Internal Revenue Code. The burden of proof was upon the petitioner to show that such determination was erroneous. Petitioner contended that the refunds from the escrow accounts did not represent income received by him and, if held to be income in any sense, such amounts properly constituted long-term capital gain. The following are essentially the *285 factors asserted by petitioner as the basis for his contention: (1) When purchases were made of the properties later sold the petitioner diminished the cost price by the amount of escrow accounts taken over at the time of purchase (since the amounts in each account varied with the number of months of accrual thereof, an average amount was calculated); (2) that the gain on each sale was calculated by him at more than his actual net gain by the amount of the escrow deposit acquired; (3) that the escrow accruals received by petitioner upon sale were no more than the amount of deposits per parcel acquired at purchase and that petitioner showed in his return for each year a gain (attributable to escrow funds) which was as great as or greater than the escrow refunds received and which petitioner reported as a part of the capital gain on each and every parcel sold. We think that the evidence introduced fails to support the foregoing allegations, and that an entirely different picture of the nature and treatment of the escrow accounts emerges from an analysis of the record before us, including the testimony of petitioner's own accountants, the tax returns, and the stipulated exhibits. The *286 factors reflected therein fatal to petitioner's case are (1) that the original escrow payments made to the mortgagee upon purchase, were considered separate from cost, and were taken as a current expense deduction against rental income for that period; (2) that the further payments made on his behalf by the agencies managing the projects were not a duplication of those originally made but were a continuation of the monthly payment requirements which were also treated as current expense deductions in preparing the net cash rental (or deficit) statements supplied to petitioner and upon which his tax returns were prepared; (3) that the refunded escrow amounts were not treated as part of the selling price of the property, did not enter into any calculation of net gains upon such sale (involved in the principal issue heretofore discussed) and were excluded from calculations of income by the accountants. In all events, petitioner has failed to meet his burden of proving facts contrary to those determined by respondent. There is no evidence in the record that the amount of the original escrow payment made by petitioner when acquiring a defense housing unit was deducted from the actual cost *287 price of such unit negotiated with the seller, which cost figure was later used in calculating the gain on sale. The only evidence in the record dealing with a diminution of socalled "cost prices" for a series of acquisitions indicates that such figures already included the amount of the original escrow payments per unit which latter amounts were then merely being segregated to leave the actual negotiated buying price intact. (As noted above, such segregated amounts were then treated as current expense.) Thus, the net gain on ultimate sale of the property calculated by petitioner (the selling price used in the calculation also being free of the amount of the escrow refund, as indicated in our Findings of Fact) was not affected by the original escrow payment (or later refund). Furthermore, there is no evidence in the record that the amounts of the escrow refunds in question were treated as a reduction of expenses taken against rental income for the respective taxable periods. Thus, there is no evidence that the escrow refunds entered into the petitioner's calculations of "business income" for the respective taxable periods in question. In view of all the foregoing considerations, we *288 think it is clear that petitioner has failed to sustain the burden of proving error in respondent's determination that the receipt of the refunded escrow accounts constituted the receipt of income within the purview of section 22(a) of the 1939 Code, and we accordingly affirm the respondent's determination which treated such partial return of deductions as ordinary income when received. See Acampo Winery and Distilleries, Inc., 7 T.C. 629, 639. Decision will be entered under Rule 50. *
Footnotes
1. See section 3.01 of NHA General Order 60-3B, effective as of August 25, 1943, and compare section 702.1 to 702.4, inclusive, of NHA General Order 60-2.↩
2. See Title 24 Code Fed. Regs., Cum. Supp. c. V, sub-c. I, §§ 580.16, 581.16.↩
*. 784 units were on hand at January 1, 1946. 163 of these had been acquired in 1944 and 621 in 1945.↩
*. Amended by an official Order of the Tax Court, dated February 7, 1957, and signed by Judge Fisher↩. The conclusion formerly read "Decisions will be entered for the respondent."